UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
 ----------------------------------------------------------------X

REGINA CUNNINGHAM and
STACEY WELLINGTON,

                          Plaintiffs,

              v.

CVS HEALTH CORPORATION,
CVS PHARMACY INC.,
VILLAGE OF PELHAM MANOR, and
RONALD RIZZO, SHANNON PRIOR,
CHRISTOPHER PIMBLE, and
JEFFREY CARPENTER, in their
respective individual and official capacities,

                         Defendants.

 ----------------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL DEMANDED**

Civil Case No. 23-1328

         Plaintiffs, Regina Cunningham and Stacey Wellington, by their attorneys, Advocates for Justice, Chartered Attorneys, hereby allege that:

## INTRODUCTION

         1.      Generally, crime negatively affects neighborhoods.[1] For example, higher crime rates drive down demand for housing,[2] cause property values to fall,[3] and increases home and car insurance rates.[4]

---

[1] Tita, George & Petras, Tricia & Greenbaum, Robert. (2006). Crime and Residential Choice: A Neighborhood Level Analysis of the Impact of Crime on Housing Prices. Journal of Quantitative Criminology. 22. 299-317. 10.1007/s10940-006-9013-z.

[2] Id.

[3] Id.

[4] See https://www.coverhound.com/insurance-learning-center/do-crime-rates-affect-your-home-insurance-costs and see https://wjla.com/news/local/carjackings-vehicle-theft-impact-car-insurance-premiums-washington-dc-victim-crime-neighborhood-rates-auto-insurance-national-bureau-nicb-top-10-hotwheels-list-stolen-most-pickup-trucks-covid-pandemic-inflation-gas-prices

2.      Potential homebuyers are less inclined to settle down in a "bad" neighborhood than in a "good" one,[5] and whether the neighborhood is "bad" or "good" often depends on residents' or potential residents' perception of their individual safety.[6]

3.      When crime rates go up, public confidence in local law enforcement decreases.[7] People generally believe that if the crime rate is going up, the police are not doing their jobs.[8]

4.      High crime rates may also lead to higher taxes.[9] For example, it is not uncommon for neighborhood residents in high crime areas to demand increases in policing,[10] which increases pressure on the local government to raise taxes to cover demanded law enforcement expenses.[11]

**The Village of Pelham Manor, New York**

5.      The Village of Pelham Manor was incorporated in 1891, and describes itself as a "welcoming, inclusive, and historic suburban village on the Sound Shore of southern Westchester County, New York. It covers approximately 1.36 square miles and is densely populated, with approximately 5,500 residents. Pelham Manor borders major cities, including Mount Vernon, New Rochelle and New York City, as well as the Village of Pelham.[12]

---

[5] See https://www.brookings.edu/wp-content/uploads/2016/06/0526_metropolitan_crime_kneebone_raphael.pdf
[6] Id.
[7] See https://thehill.com/blogs/blog-briefing-room/3704720-americans-sense-of-safety-confidence-in-police-decline-gallup/#:~:text=Pollsters%20found%20that%20the%20proportion,to%2074%20percent%20in%202021.
[8] Id.
[9] https://www.americanprogress.org/wp-content/uploads/2012/06/violent_crime.pdf
[10] Id.
[11] Id.
[12] https://www.pelhammanor.org/public-documents/pages/police-reform-reinvention-collaborative-eo-203-documents.

6.      A five-member Board of Trustees (Board) governs the Village, and a Village Manager, vested with administrative and executive authority under local code, oversees day-to-day operations.[13]

**Pelham Manor Police Department and Crime Stats**

7.      The Pelham Manor Police Department (PMPD), which is comprised of approximately 27 officers, polices the Village's residential zones and the business zones.[14]

8.      According to FBI statistics, the vast majority of crimes in the United States are property crimes,[15] which, in 2019, accounted for approximately 85% of total crimes.[16]

9.      In 2019, in Pelham Manor Village, New York, property crimes accounted for about 96% of all offenses.[17] Moreover, property crime was more prevalent in Pelham Manor Village than it was nationwide.[18]

10.      Property crimes include shoplifting, vandalism, car thefts, and burglaries, among other non-violent criminal activity.[19]

11.      In 2019, there were approximately 149 property crimes in Pelham Manor Village, or 2,677 for every 100,000 residents.[20] The national property crime rate in 2,110 incidents per 100,000 people.[21]

---

[13] Id.

[14] Id.

[15] See https://ucr.fbi.gov/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/property-crime

[16] Id.

[17] See Pelham,%20NY,%2010803%20Crime%20Rates%20and%20Crime%20Statistics%20-%20NeighborhoodScout.pdf.

[18] Id.

[19] See https://ucr.fbi.gov/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/property-crime

[20] See https://247wallst.com/city/crime-in-pelham-manor-village-new-york/ and see https://bankrate.com/insurance/car/vandalism-statistics/

[21] Id.

12.     Pelham Manor Village crime statistics report an overall upward trend in crime based on 12 years of data, with violent crime increasing and property crime increasing.[22] Based on this trend, the crime rate in Pelham Manor Village for 2023 is expected to be higher than in 2019.[23]

13.     The Pelham Manor Village Police Department (PMPD) has experienced tumultuous leadership over the past decade or so. In 2015, then Chief Mosiello resigned as a result of an email scandal wherein he participated in sending racist and demeaning emails about persons of color.[24] He was replaced by Chief Jeffrey Carpenter.

14.     In June 2021, Chief Carpenter also abruptly resigned, purportedly as a result of poor officer morale and questionable practices he allegedly instituted that violated the Criminal Procedure Law.[25]

15.     According to an email that was sent to the Village Board of Trustees, a police department insider reported that, "[Carpenter] expects officers to remain professional and respectful with the public yet he is hot headed, combative and self-serving."[26]

**Plaintiffs, Store Managers at CVS in Pelham Manor**

16.     Plaintiffs work as store managers in a local CVS store (no. 1959) within one of the Pelham Manor Village business zones.

---

[22] See https://www.cityrating.com/crime-statistics/new-york/pelham-manor-village.html

[23] See https://www.cityrating.com/crime-statistics/new-york/pelham-manor-village.html

[24] See https://www.lohud.com/story/news/local/westchester/2015/02/14/pelham-manor-police-chief-alfred-mosiello-retires-email-scandal/23440483/

[25] See https://www.lohud.com/story/news/local/westchester/pelham-manor/2021/07/09/pelham-manor-spent-11-000-probe-police-chief-jeffrey-carpenter/7900692002/

[26] Id.

17.     Plaintiffs Regina Cunningham and Stacey Wellington, who worked at a local Pelham Manor Village CVS pharmacy store (No. 1959,) as store managers, were on the wrong end of Chief Carpenter's "questionable practices" while he was still Chief.

18.     CVSP Store 1959 is located at 4760 Boston Post Rd, Pelham Manor, NY 10803, within the geographic confines of Defendant Village of Pelham Manor (the Village) and within the law enforcement jurisdictional authority of the Pelham Manor Police Department (PMPD).

19.     In reality, however, Plaintiffs essentially did their jobs "too well" and, as a result of their steady stream of calls to the PMPD for assistance related to suspected shoplifting activity, Plaintiffs were a continuing source of embarrassment for Chief Carpenter.

20.     Specifically, and for example, in 2019, Plaintiff Wellington called PMPD more than thirty (30) times to report that suspected shoplifting activity had occurred in CVSP 1959.

21.     Similarly in 2020, Plaintiff Wellington called PMPD at least thirty (30) times to report that suspected shoplifting activity had occurred in CVSP 1959.

22.     Upon information and belief, the CVS store Plaintiffs worked in had the highest or one of the highest shoplifting incidents in the Village.

23.     On information and belief, Plaintiffs made the highest number of suspected shoplifting reports to Defendant Village's PMPD compared with those made by other Defendant Village retail stores.

24.     On information and belief, the high volume of suspected shoplifting reports made by Plaintiffs to Defendant Village's PMPD negatively affected Defendant Village, including by increasing the PMPD's crime statistics, causing PMPD to appear ineffective and Defendant Village to appear unsafe.

25.     On information and belief, the high volume of suspected shoplifting reports made by Plaintiffs to Defendant Village's PMPD negatively affected Defendant Carpenter, then Chief of PMPD, including by causing Defendant Carpenter's leadership to appear ineffective.

26.     On information and belief, the high volume of suspected shoplifting reports made by Plaintiffs caused Defendant Carpenter to repeatedly call CVS's corporate office, including calls to Defendant Pimble and Defendant Prior, to complain about Plaintiffs and their suspected shoplifting reporting activity.

27.     On information and belief, during Defendant Carpenter's calls to CVS's corporate office, including calls to Defendant Pimble and Defendant Prior, Defendant Carpenter routinely and repeatedly used discriminatory and stereotypic language when complaining about Plaintiffs, including by referring to Plaintiffs as "girls," or "women," or "ladies," or by voicing "concerns" about Plaintiffs' "safety," or by alleging or implying that CVSP 1959's "all-women" or "all-girl" staff was ineffective or unsafe or dangerous because of their gender/sex, or by implying that because Plaintiffs were female, they were incapable of being effective managers, that they could not maintain a safe environment for themselves or their employees, or that they could not take care of themselves or the CVSP 1959 staff.

28.     Motivated in whole or in part because Plaintiffs were female, Defendant Carpenter repeatedly recommended to the CVS Defendants, that they "speak with" Plaintiffs, with the intention of discouraging or reprimanding or disciplining Plaintiffs because they were making "too many" suspected shoplifting calls to PMPD.

29.     Motivated in whole or in part because Plaintiffs were female, Defendant Carpenter advocated that the CVS Defendants install security cameras and/or hire security guards (meaning men) at CVSP 1959 to protect "the girls."

30.     Motivated in whole or in part because Plaintiffs were female, Defendant Carpenter complained about the alleged absence of sufficient safety measures at CVSP 1959, including the lack of security cameras and/or security guards (meaning men).

31.     Upon information and belief, Defendant Carpenter attributed or blamed the high volume of suspected shoplifting activity at CVSP 1959 on Plaintiffs' gender/sex.

32.     As a direct consequence of Defendant Carpenter's targeted complaints about Plaintiffs' gender/sex, the CVS Defendants disproportionately on the basis of gender/sex investigated Plaintiffs' suspected shoplifting reporting activity to PMPD with the intention of pretextually disciplining Plaintiffs for alleged violations of CVS corporate Policies.

33.     As a direct consequence of Defendant Carpenter's targeted complaints about Plaintiffs' gender/sex, the CVS Defendants disproportionately on the basis of gender/sex investigated Plaintiffs' suspected shoplifting reporting activity to PMPD with the intention of pretextually terminating Plaintiffs for alleged violations of CVS corporate Polices.

34.     As a direct consequence of Defendant Carpenter's targeted complaints about Plaintiffs' gender/sex, the CVS Defendants discriminatorily on the basis of gender/sex investigated Plaintiffs' suspected shoplifting calls to PMPD with the intention of pretextually disciplining or terminating Plaintiffs for alleged violations of CVS corporate Policies.

35.     As a direct consequence of Defendant Carpenter's targeted complaints about Plaintiffs' gender/sex, for the first time ever in Plaintiff Wellington's over 12-year career as CVS store manager, the CVS Defendants, on or about June 12, 2020, engaged in pretextual discipline against Plaintiff Wellington for alleged violations of CVS corporate Policies on April 9, 2020.

36.     As a direct consequence of Defendant Carpenter's targeted complaints about Plaintiffs' gender/sex, for the first time ever in Plaintiff Cunningham's over 8-year career as

CVS store manager, the CVS Defendants, on or about June 12, 2020, engaged in pretextual discipline against Plaintiff Cunningham for alleged violations of CVS corporate Policies on April 9, 2020.

37.     As a direct consequence of Defendant Carpenter's targeted complaints about Plaintiffs' gender/sex, the CVS Defendants discriminated against Plaintiffs on the basis of Plaintiffs' gender/sex in the terms and conditions of Plaintiffs' employment by disproportionately investigating, disciplining, and terminating Plaintiffs.

38.     As a direct consequence of Defendant Carpenter's targeted complaints about Plaintiffs' gender/sex, the CVS Defendants, on or about January 14, 2021, engaged in pretextual termination against both Plaintiffs for alleged violations of CVS corporate Policies.

39.     Shortly after the CVS Defendants terminated Plaintiffs, the CVS Defendants replaced CVSP 1959 female store managers with male store managers, each of whom were individuals of color.

**The Aftereffects of George Floyd's Murder Added Pressure on PMPD**

40.     In 2020, however, unlike 2019, the police and police departments across the country, including the PMPD, came under intense scrutiny because of the death of George Floyd, which occurred at the end of March 2020. As a result, public protests ignited nationwide.

41.     In New York State, the governor concluded "that urgent and immediate action is needed to eliminate racial inequities in policing, to modify and modernize policing strategies, policies, procedures, and practices, and to develop practices to better address the particular needs of communities of color to promote public safety, improve community engagement, and foster trust." (Executive Order 203, issued on June 12, 2020).

42.     The governor then ordered that each local law enforcement agency in New York must undertake a comprehensive review of their respective policing policies and strategies, and

in so doing, engage stakeholders in determining responsive police processes and procedures to address community policing needs.

43.    Upon information and belief, Chief Carpenter, as head of the PMPD, was aware of the governor's order as it was being considered and developed and consequently began a review of his department's policies and practices.

**Chief Carpenter's Unlawful Gender-Based Actions Against Plaintiffs**

44.    Chief Carpenter repeatedly expressed his "discomfort" with the idea of an "all-girl" CVS team to former Deputy Mayor and Police Commissioner, Louis Annunziata.

45.    Chief Carpenter also continually complained to CVS management that "these girls" should not be in charge of the CVS store, not only because they were white women, but because they did not "fit the mold" of who Chief Carpenter believed should be in charge of the CVS store in Pelham Manor Village to control the suspected shoplifting activity.

46.    Defendant Carpenter also admitted to former Commissioner Annunziata that he, Carpenter, had serious concerns about Plaintiffs' CVS store being responsible for increasing the crime rate in Pelham Manor, due to the number of shoplifting cases Plaintiffs called in.

47.    Defendant Carpenter told Annunziata and CVS management that he wanted CVS to hire security guards and/or to install additional cameras for security. CVS failed to do so.

48.    Chief Carpenter essentially engaged in a discriminatory campaign to get rid of Plaintiffs, both of whom he derogatorily and continually referred to as "girls."

49.    Chief Carpenter relayed his discriminatory comments and opinions about Plaintiffs to Annunziata, including Defendant Carpenter's "concerns" for Plaintiffs' safety (which were feigned) and their [in]ability to perform their jobs.

**CVS Failed to Protect Its Employees Against Police Discrimination**

50.      Defendant Carpenter also admitted to Annunziata that he had contacted the CVS management, on several occasions, including telephone conferences and in-person meetings to discuss his "concerns" for the "safety of the girls" at their store, including conversations with Defendant Christopher Pimble and former Loss Prevention Manager, Kevin Charles.

51.      Despite Chief Carpenter's repeated complaints, however, at no time did anyone from CVS corporate office, or any of the individual CVS Defendants, contact Plaintiffs to ask whether they were concerned for their own safety or the safety of the other employees.

52.      Chief Carpenter's complaints to CVS management about the "all girl" staff, and his alleged "concerns" for their "safety" took their toll on Plaintiffs.

53.      Plaintiffs feared calling the police for assistance even when they observed shoplifting activity. Plaintiffs also suffered from anxiety and fear that if they did their jobs, they would lose their jobs.

**CVS and PMPD's Pretextual Discrimination Against Plaintiffs**

54.      Chief Carpenter's discrimination campaign against Plaintiffs, however, was successful.

55.      Because of Carpenter's complaints, Plaintiffs were discriminatorily terminated by CVS management for concocted alleged violations of CVS company shoplifting policies on or about January 14, 2021.

56.      Instead of protecting Plaintiffs from the discrimination by Chief Carpenter CVS was privy to, CVS managers facilitated the discrimination against Plaintiffs by participating in false and pretextual criticisms of Plaintiffs' work performance, all with the objective of getting rid of Plaintiffs and making Chief Carpenter happy.

57.     Upon information and belief, keeping the police happy was a likely CVS management objective since they needed the police to continually respond to the store's shoplifting problems.

58.     Christopher Pimble, who was new at his job, was also intent on developing and maintaining good relationships with the local police departments for the stores he supervised.

59.     Since Pimble was on the receiving end of Carpenter's multiple complaints, which were discriminatory in nature, Pimble took active steps to get rid of the "source" of the problem, namely, Plaintiffs, rather than engage Carpenter in what would likely be contentious dialogue about Carpenter's continuous use of discriminatory remarks about the all-female workforce at CVS store 1959.

**Plaintiffs and the Other CVS Staff Were Replaced by an All-Non-White, Male Workforce**

60.     Plaintiffs' terminations set off a series of terminations and resignations throughout the store.

61.     On February 20, 2021 CVS 1959 store employee Lynn Gonzales resigned, citing "an environment of disrespect, stress, and feeling as if [she] didn't belong," as her reasons for resignation. She reported that CVS 1959 had "not been the same… [it] is no longer a team," following the termination of Plaintiffs.

62.     On February 21, 2021 CVS 1959 store employee Nicole Hollis resigned, citing a "toxic work environment" as her reason for resignation. Hollis further stated that since the Plaintiffs' terminations, the new management team had made her "hate going to work," which was a feeling she had never experienced before.

63.     On February 22, 2021, CVS 1959 store employee Cassandra Salinas resigned, citing Plaintiffs' terminations as reasons for her resignation. Salinas reported that the new managers were devoid of compassion for their employees, contrary to the Plaintiffs. Salinas

contacted CVS Advice and Counsel to report her reason for resignation and the new managers' lack of compassion for the staff.

64.    On March 1, 2021 CVS 1959 store employee Oksana Samuel resigned, citing increasing depression caused by the new managers as a reason for resignation. Samuel also explained her very positive relationship with Plaintiffs and her enjoyment of work before their termination.

65.    CVS 1959 lost four female workers due to resignations. Out of the original eight female employees at CVS 1959, only two remained.

66.    Since January 14, 2021, CVS replaced almost every single female with males of color so that by March 2021, men essentially "took over" the CVS store as store employees and managers.

67.    Upon information and belief, both CVS and PMPD and particularly Chief Carpenter, considered men more of a deterrent to potential shoplifting activity than an all-white, all-female workforce.

68.    As further described herein, Defendants, acting individually, and jointly and in concert and aiding the other, caused Plaintiffs to suffer severe emotional distress and financial, professional, and personal injury and harm, including to their respective careers and to their respective professional and personal reputations, for which they each seek damages from Defendants, individually and jointly.

69.    Plaintiffs seek declaratory, injunctive, pecuniary, and compensatory relief, against each Defendant as permissible under law, and punitive damages against each Defendant as permissible under law in amounts to be determined at trial.

70.     Plaintiffs also seeks attorneys' fees, costs, expenses, and all other appropriate and just relief pursuant to federal, state, and local laws.

71.     Plaintiffs seek a jury trial on all claims for which a trial by jury is accorded under the law.

## JURISDICTION AND VENUE

72.     The claims asserted herein arise under Title VII; the First and Fourteenth Amendments to the Constitution of the United States; Section 1983; the NYSHRL; and the New York State common law.

73.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this civil action arises under the Constitution and laws of the United States.

74.     This Court also has jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are integrally related to Plaintiffs' federal law claims.

75.     Defendants CVS Health Corporation (CVSH), its affiliate CVS Pharmacy, Inc. (CVSP) (collectively, CVS corporate Defendants), and CVS employees Ronald Rizzo, CVS District Manager, Chris Pimble, CVS Loss Prevention Manager, and Shannon Prior, Regional Asset Protection Manager, in their respective individual and official capacities (collectively, the CVS Defendants), acting individually or jointly or in concert or aiding each other, unlawfully discriminated against each Plaintiff by terminating Plaintiff's employment because of Plaintiff's gender/sex in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 (Title VII), 42 U.S.C. §§ 2000e-2000e-17; and the New York State Human Rights Law, N.Y. Exec. Law (NYSHRL), § 296.

76.     The CVS corporate Defendants, CVSH and CVSP, were joint employers of their employees, including Plaintiffs, who worked at CSVP retail stores, for purposes that included human resource functions such as employee training, supervision, distribution and enforcement of personnel policies and procedures, discipline, and involuntary termination.

77.     The CVS Defendants, acting individually and/or jointly or in concert and aiding each other, with Defendant Village of Pelham Manor (the Village) and Defendant Jeffrey Carpenter, the former Police Chief of the Pelham Manor Police Department (PMPD) (collectively, the Pelham Manor Defendants and/or PMPD), acted under the color of state law in violation of Plaintiffs' state, federal, and constitutional rights by unlawfully discriminating against each Plaintiff because of her gender/sex by terminating or causing the termination of Plaintiff's employment because of Plaintiff's gender/sex in violation of Title VII and the NYSHRL.

78.     The CVS Defendants, also referred to as CVS management, acting individually and/or jointly and in concert or aiding each other, with the Pelham Manor Defendants, acted under the color of state law in violation of both Plaintiff's state, federal, and constitutional rights by unlawfully terminating or causing the termination of each Plaintiff's employment because Plaintiffs' reported to Defendants suspected shoplifting activity that occurred at CVSP 1959, which is a matter of public concern.

79.     Reporting suspected shoplifting activity to the police is a matter of public concern.

80.     Reporting suspected shoplifting activity to the police is protected petitioning activity within the meaning of the First and Fourteenth Amendments of the United States Constitution.

81.     Plaintiffs' reporting suspected shoplifting activity that occurred at CVSP 1959 to Defendants is a matter of public concern.

82.     Plaintiffs' reporting suspected shoplifting activity to Defendants is protected petitioning activity within the meaning of the First and Fourteenth Amendments of the United States Constitution.

83.     Defendants, acting individually and/or jointly or in concert or aiding each other, engaged in multiple violations of law against each Plaintiff by unlawfully terminating or causing the termination of Plaintiff's employment, in violation of the First and Fourteenth Amendments and 42 U.S.C. § 1983 (Section 1983 or § 1983) because Plaintiffs reported to Defendants suspected shoplifting activity that occurred at CVSP 1959.

84.     By subjecting Plaintiffs to unconstitutional and unlawful discriminatory actions, Defendants acting individually or jointly or in concert or aiding each other, intentionally or negligently caused each Plaintiff to suffer severe emotional distress and financial, professional, and personal injury and harm, entitling each Plaintiff to recover monetary and consequential damages against each Defendant, and punitive damages each Defendant (except the Village of Pelham Manor).

85.     Venue is proper in the United States District Court for the Southern District of New York since at all relevant times Plaintiffs resided within the District, and the claims against each Defendant arose in this District.

## **PARTIES**

86.     Plaintiffs Regina Cunningham and Stacey Wellington are both citizens of the United States. They both reside in the County of Rockland, State of New York, and within the jurisdiction of the United States District Court for the Southern District of New York.

87.     CVS Health Corp. (CVSH) describes itself as a "health solutions company;" it engages in the business of providing healthcare services throughout the United States, including conducting substantial business within the State of New York.

88.     Upon information and belief, Defendant CVSH is headquartered at One CVS Drive, Woonsocket, Rhode Island, 02895, and is incorporated in the State of Delaware.

89.     Defendant CVS Pharmacy Inc. (CVSP) is an American retail corporation and an affiliate of Defendant CVS Health Corporation (CVSH); it conducts substantial business within the State of New York.

90.     Defendant CVSP is headquartered at One CVS Drive, Woonsocket, RI, 02895 and, upon information and belief, is incorporated in the State of Massachusetts.

91.     Defendant CVSP owns and manages CVSP retail stores throughout the United States, including CVSP Store 1959 (CVSP 1959), where Plaintiffs worked.

92.     CVSP 1959 is located at 4760 Boston Post Rd, Pelham Manor, NY 10803.

93.     Defendants CVSH and CVSP as further described herein acted jointly or in concert or aiding each other, as joint employers within the meaning of applicable state and federal laws.

94.     Defendant Village of Pelham Manor, NY is a municipality located in Westchester County, New York, United States. At all times relevant herein Defendant Village acted under color of state law.

95.     Upon information and belief, the mailing address of the Village of Pelham Manor municipality is located at 4 Penfield Place, Pelham Manor, NY 10803.

96.     Pelham Manor Police Department is a law enforcement agency and, upon information and belief, is a Department under the jurisdiction, management, and control of

Defendant Village, with no separate legal status; nonetheless, to the extent applicable, at all times relevant herein, PMPD and each of its police officers acted under color of state law.

97.     The CVS Defendants, because they each acted individually, jointly, in concert, and each aiding the other with the Village and the PMPD, acted under color of state law.

98.     Defendant Chris Pimble is the Loss Prevention Manager for the CVS corporate Defendants and is responsible for loss prevention at CVSP retail stores, including CVSP 1959. He is being sued in his individual and official (professional) capacities.

99.     Defendant Shannon Prior is a Regional Asset Protection Manager for CVS corporate Defendants. Upon information and belief, CVS 1959 is within Defendant Prior's assigned region such that she is responsible for Asset Protection matters that arise within that store. She is being sued in her individual and official (professional) capacities.

100.    Defendant Ronald Rizzo is the District Manager for the CVS corporate Defendants and is responsible for CVSP 1959. He is being sued in his individual and official (professional) capacities.

101.    Upon information and belief, Defendant Rizzo is a resident of Westchester County, New York.

102.    Defendant Jeffrey Carpenter is the former Chief of Police for Pelham Manor Police Department, NY. At all relevant times herein, Defendant Carpenter was a public official employed by Defendant Village of Pelham Manor, NY, acted under color of state law, and is being sued in his personal and official capacity.

103.    Upon information and belief, Defendant Carpenter is a resident of Westchester County, New York.

## FACTUAL ALLEGATIONS IN SUPPORT OF CLAIMS

**Defendant Carpenter's Discriminatory Complaints About Plaintiffs Based on Gender/Sex**

104.     Defendant Pimble began investigating and singling out the Plaintiffs leading to termination procedures against Plaintiffs only after Chief Carpenter began calling CVS corporate Defendants to complain about Plaintiffs, including expressing his "concerns" about the store's all-female staff.

105.     Upon information and belief, Defendant Carpenter called CVS corporate Defendants on multiple occasions to complain about Plaintiffs, each of which was motivated by and because of Plaintiffs' gender/sex

106.     On or about July 31, 2020, Defendant Carpenter requested a meeting with Defendant Pimble, Detective Gregory Sancho, and Plaintiffs. Defendant Carpenter claimed he wanted to discuss how and what CVS could do to "help" improve the safety and security at CVS 1959 for the all-female staff.

107.     Defendant Carpenter did not show up for the meeting he requested. Defendant Pimble and Plaintiffs met with Detective Gregory Sancho, who was a member of the PMPD.

108.     Detective Sancho provided statistical data regarding CVSP 1959 compared with other retailers in the Pelham Manor community documenting the high number of shoplifting cases CVSP 1959 had as compared with the surrounding retailers.

109.     During the meeting, Defendant Pimble told Detective Sancho that CVS would not hire security guards, nor would they install any additional security cameras.

110.     On or about September 15, 2020, a meeting was requested by Former Deputy Mayor/Police Commissioner Louis Annunziata and Defendant Chief Carpenter with the Plaintiffs to obtain "feedback" on the New York State ordered Executive Order 203: New York State Police Reform and Reinvention Collaborative.

111.    Annunziata informed Plaintiffs that the Pelham Manor Trustees plan was to meet with local organizations to "conduct consultations with representatives from businesses to hear their personal experiences with our police response to their calls for assistance when necessary."

**Suspected Shoplifting Activity on April 9, 2020**

112.    On the morning of April 9, 2020, while Plaintiffs were working their shifts as store managers at CVSP 1959, Plaintiff Wellington reported to Plaintiff Cunningham that she observed a male customer taking CVS products from the shelf and putting them in a bag he was carrying.

113.    When Plaintiff Wellington approached the male and asked him if he needed any help, the male got "in her face" and then spit on her.

114.    Spitting on someone is akin to a physical assault.

115.    Because this incident occurred shortly following the state-wide COVID-19 pandemic declaration, spitting on another person was reasonably believed to carry with it a potentially high risk of COVID-19 infection, which was reasonably believed to be life-threatening.

116.    As a result of being spit on, Plaintiff Wellington retreated from the male customer.

117.    The male customer appeared to continue to fill his bag with CVS merchandise and then left the store without paying for any CVS store items.

118.    Plaintiffs contacted the PMPD and reported the suspected shoplifting activity.

119.    After phoning the police, Plaintiff Wellington left the building to get some air to attempt to recover from the spitting assault she experienced.

120.    While Plaintiff Wellington was outside the store, she observed a PMPD squad car and flagged it down, explaining the suspected shoplifting activity that was previously observed.

121.     The PMPD officers stopped a male near the CVS store and attempted to take him into custody. The male resisted the officers and repeatedly spit at the PMPD officers.

122.     Upon information and belief, the police officers left the scene because the male continued to spit at them, out of concern for their respective health and safety because of the reasonable belief of COVID-19 infection from the male's salvia.

123.     No one from the PMPD took a report or a statement from either Plaintiff about the shoplifting activity observed by Plaintiffs on April 9, 2020.

**Targeted Discriminatory & Disproportionate Pretextual Discipline of Plaintiffs on the Basis of Gender/Sex**

124.     On or around June 12, 2020, District Manager Ronald Rizzo came to CVS 1959 and issued each Plaintiff a Level III write-up (final warning prior to termination) for leaving the building during a shoplifting incident.

125.     Plaintiff Wellington's discipline report erroneously alleges that she left the building to flag down a police officer.

126.     Because she left the building to check on Plaintiff Wellington following the spitting assault, Plaintiff Cunningham was written up for leaving the building during a shoplifting incident.

127.     Three months AFTER the April 9, 2020 incident, and AFTER Defendant Carpenter called the CVS Defendants to complain about Plaintiffs calling the PMPD about suspected shoplifting activity, Plaintiffs were interviewed and asked for detailed statements in anticipation of their being pretextually disciplined for an event that previously occurred.

128.     Thereafter, Plaintiffs reviewed the monthly Asset Protection Training/Quiz with Defendant Rizzo. The topic that was the subject of the review for the month of June 2020 was Shoplifting Apprehension.

129.    Upon reviewing the Training/Quiz with Defendant Rizzo, both Plaintiffs Cunningham and Wellington asked for clarification regarding the parameters of "apprehension and detaining" a shoplifter because they both had just been placed on a Level III warning for "leaving the building during an occurrence of an internal altercation."

130.    Plaintiffs Cunningham and Wellington asked Defendant Rizzo detailed questions about the direction to "Authorized" Managers to "apprehend and detain" suspected shoplifters after they had just been reprimanded and placed on Level III warning though they had faithfully executed the Shoplifter Apprehension Guidelines.

131.    Defendant Rizzo told Plaintiffs that he did not have the answers to the questions they were asking.

132.    Moreover, and despite explicit written instructions to the contrary contained in CVS Policies, Defendant Rizzo told Plaintiffs: "We absolutely should not and do not apprehend or detain anyone; that is for the police department to do."

133.    Defendant Rizzo asked Plaintiff Wellington to text him pictures of the Training/Quiz so he could follow up with Defendant Pimble concerning the questions and concerns articulated by Plaintiffs regarding "apprehending and detaining" as it pertained to the June 2020 Asset Protection Training/Quiz.

134.    Plaintiff Wellington promptly texted Defendant Rizzo the screenshots requested.

135.    Defendant Rizzo instructed Plaintiffs to complete the required Training/Quiz and advised that he would follow up with Plaintiffs regarding their questions and concerns after he spoke with Defendant Pimble.

136.    Despite his advisement that he would follow up with Plaintiffs, neither Defendant Rizzo nor Defendant Pimble followed up with either Plaintiff regarding answers to any of their

questions or concerns about the June 2020 Asset Protection Training/Quiz on the CVS Shoplifting Apprehension Policy.

137.    Plaintiff Wellington was assaulted by the male customer who spat on her while faithfully executing the "five steps" prescribed in CVS's Shoplifter Apprehension Guidelines.

138.    Plaintiff Wellington sought out CVS's Employee Assistance Program to speak with a licensed therapist about the assault and about being reprimanded for it.

139.    Plaintiff Wellington struggled emotionally after the spitting incident and continues to suffer emotional harm.

140.    Upon information and belief, the CVS Defendants possess picture and video evidence of multiple CVS apprehensions that demonstrate that many non-white CVS store managers violate multiple CVS Policies regarding Shoplifting Apprehension.

141.    Upon information and belief, none of the non-white CVS store managers suffer any adverse repercussions for their respective CVS Policies' violations.

142.    Upon information and belief, the CVS Defendants possess pictures and video evidence that shows that Defendants were aware of and received copies of pictures and videos, as well as communications, from many CVS store managers engaging in the practices that violate CVS policies and procedures.

143.    The CVS Defendants singled-out Plaintiffs because of their gender/sex for adverse employment action.

144.    The CVS Defendants singled-out Plaintiffs because of pressure they individually and collectively received from PMPD law enforcement, notably Defendant Carpenter, about Plaintiffs' shoplifting reporting activity.

**Suspected Shoplifting Activity on December 24, 2020**

145.    On December 24, 2020, while Plaintiffs were working their shift as store managers at CVSP 1959, a store employee told Plaintiff Cunningham that she observed a known shoplifter enter the store, take a CVS item off the shelf, and place it in his shopping bag.

146.    Plaintiff Cunningham approached the checkout counter where the known shoplifter was standing and looked into the customer/suspect's bag. Plaintiff saw what she believed was CVS merchandise in the customer/suspect's bag and did not see the customer/suspect pay for any of the items that were in his bag.

147.    Plaintiff Cunningham telephoned the PMPD as soon as the customer/suspect left the store.

148.    Upon information and belief, officers from the PMPD stopped a person purportedly matching the customer/suspect's description on Boston Post Road near CVSP 1959. Officers searched the individual's bag but found that all items therein appeared to have been purchased at the Dollar Tree store since the individual produced a sales receipt for what appeared to be proof of purchase of the items.

149.    PMPD did not conduct a "show up" of the detained individual for either Plaintiff or the CVSP 1959 employee to determine whether the detained individual was the previously observed customer/suspect.

150.    In a "show up," the police arrange for the witness(es) to view the detained individual for potential identification as the customer/suspect who the witness(es) believed to have engaged in shoplifting activity.

151.    The PMPD also did not allow either Plaintiff or the CVSP 1959 employee to examine the items in the detained individual's bag or the receipt that he produced to determine the origin of the items or the authenticity of the receipt.

152.    Both Plaintiffs had previously participated in numerous "show ups" arranged by the PMPD during the course of their employment as Store Managers for CVSP 1959 regarding their respective reporting of shoplifting activity at the store to the PMPD.

153.    Upon information and belief, because the detaining PMPD police officers believed they could not establish that the detained individual was the customer/suspect or that the individual detained had engaged in shoplifting activity, the detained individual was "free to leave."

154.    Plaintiffs Cunningham and Wellington faithfully adhered to the steps laid out in CVS' Asset Protection Policy and Shoplifting Guidelines during the incident of December 24, 2020.

**Defendant Carpenter's Continued Complaints About Plaintiffs' Gender**

155.    Upon information and belief, on January 6, 2021, Defendant Carpenter conducted a telephone conference call with Defendant Pimble to discuss his "larceny concerns," and the multiple calls for service Plaintiffs were making, including the suspected shoplifting activity that occurred on December 24, 2020, which Defendant Carpenter claimed was a "false report" of larceny.

156.    Upon information and belief, Defendant Prior agreed to "swiftly address" Defendant Carpenter's concerns.

157.    Upon information and belief, Defendant Pimble agreed to visit and evaluate the store and Plaintiffs.

158.    Upon information and belief, the January 6, 2021 complaint by Defendant Carpenter was at least the third such complaint against Plaintiffs and their suspected shoplifting activity reports made to PMPD wherein Defendant Carpenter articulated complaints about Plaintiffs, referred to as "larceny concerns" and the "all-girl" staff.

24

**Targeted Discriminatory & Disproportionate Pretextual Discipline of Plaintiffs on the Basis of Gender/Sex by CVS Defendants**

159.    On or about January 12, 2021, Defendants Chris Pimble and Shannon Prior met individually with each Plaintiff to discuss the December 24, 2020 incident.

160.    Prior to Plaintiff Wellington entering the room, Defendants Pimble and Prior had conferenced in Defendant Ronald Rizzo, CVS Health Corporation's District Manager, to join the meeting remotely by telephone.

161.    Plaintiff Wellington was not aware that Defendant Rizzo was listening in on the meeting. At no time did either Defendant Pimble or Prior inform Plaintiff Wellington that Defendant Rizzo was listening in on the telephone.

162.    Plaintiff Wellington found out that Defendant Rizzo was listening to the meeting after the meeting was over.

163.    During Plaintiff Wellington's meeting with Defendants Pimble and Prior, Defendant Pimble accused Wellington of violating CVS "Asset Protection Policy" and "Shoplifting Apprehension Guidelines," which established CVS Policies, including for apprehending and detaining a shoplifting suspect.

164.    Prior to Plaintiff Cunningham entering the room, Defendants Pimble and Prior had conferenced in Defendant Ronald Rizzo, CVS Health Corporation's District Manager, to join the meeting remotely by telephone.

165.    During Plaintiff Cunningham's meeting with Defendants Pimble and Prior and telephonically Defendant Rizzo, Defendant Pimble accused Cunningham of violating CVS "Asset Protection Policy" and "Shoplifting Apprehension Guidelines," which establish CVS Policies, including apprehending and detailing a shoplifting suspect.

166.     At the close of their meetings on January 12, 2021, Defendant Rizzo told both Plaintiffs they were suspended from employment pending review of the incidents by CVS corporate counsel.

**CVS Defendants Issued Unreasonable and Unrealistic CVS Policies**

167.     Unbeknownst to Plaintiffs, the CVS corporate Defendants issued revised CVS Policies on May 27, 2020, October 16, 2020, and December 2, 2020.

168.     Upon information and belief, according to the CVS corporate Defendants, the changes were made to "clarify procedures" and to include "added [v]erbiage to increase the safety of colleagues."

169.     At no time during any review and or revision of CVS Policies, did any of the CVS Defendants make Plaintiffs (or any other employee at CVS 1959) aware that changes or revisions had been made to CVS Policies. Further, Plaintiffs were never instructed by any CVS Defendant to review, read, or post any of CVS Policy changes or revisions.

170.     Upon information and belief, prior to the 2020 updates, CVS Policies pertaining to shoplifting and apprehending and detaining suspected shoplifters had not been updated since 2018.

171.     CVS "Asset Protection Policies" and "Shoplifting Apprehension Guidelines" prohibit employees from pursuing suspected shoplifters or leaving the store during an incident. The CVS Policies also demand that employees notify police as soon as a shoplifting suspect passes the final point-of-sale (POS) without paying for CVS merchandise.

172.     Under CVS Shoplifter Apprehension Guidelines:

        a.      CVS staff may not chase down and apprehend shoplifters once they pass the final point of sale (POS); and

        b.      CVS staff must contact police "as soon as [they] can do so safely."

173.   CVS Shoplifter Apprehension Guidelines require that employees follow these five steps when encountering a shoplifting scenario:

     a.     Observe suspect enter area where product is selected;

     b.     Observe suspect select product from the shelf;

     c.     Observe suspect conceal product;

     d.     Maintain constant uninterrupted surveillance of the suspect; and

     e.     Wait until subject has passed all points of sale without making attempt to pay.

174.   Throughout their employment with CVS, Plaintiffs have always followed the CVS Policies.

175.   While CVS Policies authorizes store managers to "approach and detain" suspected shoplifters, neither Plaintiff has done so at any time during their employment.

**Discriminatory Termination of Plaintiffs**

176.   On January 14, 2021, Plaintiffs were separately contacted by Defendant Rizzo informing them that they had both been terminated from employment.

177.   Defendant Wellington's notification of termination listed an incident that purportedly occurred December 16, 2020 as the reason for her termination. Plaintiff Wellington was not involved in any incident on December 16, 2020.

178.   Plaintiffs were terminated from their employment at CVS without receiving letters of termination. Neither Plaintiff ever received termination documentation from any of the CVS Defendants, which violated CVS corporate policy.

**Unequal Treatment on the Basis of Gender**

179.   Defendant Ronald Rizzo violated CVS's "Manager or Supervisor Responsibilities for Employee or Contract Worker Separation" Policy that states that Managers and Supervisors

are responsible for the timely completion of documentation when employees leave the employ of the CVS corporate Defendants.

        a.     For involuntary terminations, Management/HR must send an email to EmploymentTerminations@CVSHealth.com. This notification must occur within 24 hours of notice of termination. Further, the CVS Defendants are responsible to take necessary steps to initiate the remainder of the separation process to formally separate a Colleague from employment within 72 hours of the effective separation/last day worked.

        b.     The separation policy states, "Failure to execute the separation procedure within the stated timelines may result in disciplinary action."

180.    The CVS Defendants, including Defendant Rizzo, failed to comply with the Involuntary Separation Checklist, including the failure to execute, review, or otherwise complete documentation for either Plaintiff's termination.

181.    Upon information and belief, none of the individual CVS Defendants were disciplined for their failures to comply with CVS policies and procedures.

**Consequences of Defendants' Unlawful Actions**

182.    Due to her termination and the delay by the CVS Defendants in processing related termination documents, Plaintiff Wellington was denied health coverage and could not apply for any health-related assistance because the CVS Defendants failed to follow the termination policies and procedures.

183.    Due to delay in processing her termination, Plaintiff Wellington was forced to stop physical therapy for her injured hand.

184.    Plaintiff Wellington needed surgery in November 2021. Because her health insurance was cut off by CVS Defendants, she was unable to follow up with surgeon for progress updates.

185.    Plaintiff Wellington endured pain and suffering due to abruptly ceasing physical therapy and not being able to visit her doctor due to having no health insurance.

186.    Following Plaintiff Cunningham's termination by Defendant Rizzo, the CVS corporate Defendants continued to pay Plaintiff Cunningham, treating her as a salaried manager.

187.    Plaintiff Cunningham is currently being taken to collections by the CVS corporate Defendants due to an alleged "overpayment" of her salary due to the individual CVS Defendants' failure to follow the separation policies and procedures regarding Plaintiffs' termination in a timely manner.

**Plaintiffs' Received Favorable Performance Reviews During Employment from the CVS Defendants**

188.    Since they were each hired, both Plaintiffs have received consistently 'excellent' or 'perfect' marks on their internal reviews by the CVS Defendants.

189.    Both Plaintiffs have received and been awarded CVS's most prestigious yearly top manager award, "Paragon."

190.    The CVS Defendants chose Plaintiffs to work on special projects and train new Managers and Pharmacists for various CVS Districts and Regions.

191.    At no time were the Plaintiffs actions or behaviors regarding CVS Policies, including Shoplifting Apprehension or the five steps of apprehending or detaining ever corrected.

192.    At no time did the CVS Defendants issue negative or corrective feedback to Plaintiffs after receiving Plaintiff's written shoplifting activity reports.

193.    The CVS Defendants did not engage in any performance corrections regarding Plaintiffs' shoplifting activity reports, including for prior similar behaviors for which the CVS Defendants had disciplined or terminated Plaintiffs.

194.    On occasion, Defendant Pimble praised Plaintiffs for a great job in having suspects apprehended.

195.    Defendant Pimble suggested other CVS managers reach out to Plaintiffs to learn how to input shoplifting event reports in CVS ThinkLP system.

196.    Plaintiffs submitted over 40 cases of shoplifting activity from May 2020 to December 2020 into the CVS Loss Prevention ThinkLP system, which contained apprehension details and loss amounts.

197.    Upon information and belief all inputs into the ThinkLP system were reviewed by the CVS Defendants, including Defendants Ronald Rizzo, Chris Pimble, and Shannon Prior.

198.    Upon information and belief, during the eight months of tracking prior to Plaintiffs' termination, CVSP 1959 reported losses of $11,162.50

199.    Acting individually, or jointly or in concert, the CVS Defendants, though non-state actors, acted under color of State law because they acted in concert with the Pelham Defendants both of whom sought adverse employment actions against Plaintiffs, including disparate treatment, unwarranted discipline, or termination, because Plaintiffs engaged in protected First Amendment activity, namely, complained about and/or made police reports of suspected unlawful shoplifting activity to the PMPD and made reports of suspected shoplifting activity to the CVS Defendants.

**Plaintiffs Suffered Physical and Emotional Distress**

200.    Because of her treatment, including suffering adverse employment actions, Plaintiff Wellington experienced depression, nightmares, sleeplessness, severe mental and emotional distress, anxiety, worry about getting another job, financial hardship, medical issues with her arthritis because her termination interfered with her ability to obtain needed medication and treatment, and physical pain and suffering.

201.    Because of her treatment, including suffering adverse employment actions,

Plaintiff Cunningham experienced depression, nightmares, sleeplessness, stress, mental and

emotion distress, self-doubt, fear, fear about finding new employment, and financial hardship.

### FIRST CLAIM AGAINST DEFENDANTS

**(Discriminatory/Pretextual Termination Because of Plaintiffs' Gender/Sex
under Title VII against the CVS corporate Defendants)**

202.    Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 201

as if set forth herein.

203.    Plaintiffs are "persons" and "employees" within the meaning of Title VII.

204.    Defendants CVS Health Corporation and CVS Pharmacy, Inc. are "employers"

within the meaning of Title VII.

205.    Defendants Ronald Rizzo, Christopher Pimble, and Shannon Prior were

"supervisors" and/or "agents of the employer" within the meaning of Title VII.

206.    By their individual and joint actions described herein, the CVS corporate

Defendants have discriminatorily and pretextually terminated Plaintiffs because of their

gender/sex in violation of Title VII.

207.    As a result of the unlawful actions and inactions described herein, Plaintiffs were

injured, suffered, and continue to suffer personal injury, including loss of employment, lost

wages, lost benefits, loss of reputation within the community, and physical and emotional

distress among other losses and injuries described herein, in amounts to be determined at trial.

208.    Defendants' discriminatory and pretextual actions and inactions were taken with

reckless indifference to Plaintiffs' legal rights entitling them to punitive damages under Title VII

against each of the CVS corporate Defendants.

## SECOND CLAIM AGAINST DEFENDANTS

### (Discriminatory/Pretextual Termination Because of Plaintiffs' Gender/Sex under NYSHRL against the CVS corporate Defendants)

209.    Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 208 as if set forth herein.

210.    Plaintiffs are "persons" and "employees" within the meaning of the NYSHRL. Defendants CVS Health Corporation and CVS Pharmacy, Inc. are "employers" within the meaning of the NYSHRL.

211.    Defendants Ronald Rizzo, Christopher Pimble, and Shannon Prior were "supervisors" and/or "agents of the employer" within the meaning of the NYSHRL.

212.    By their individual and joint actions described herein, the CVS corporate Defendants have discriminatorily and pretextually terminated Plaintiffs because of their gender/sex in violation of NYSHRL.

213.    As a result of the unlawful actions and inactions described herein, Plaintiffs were injured, suffered, and continue to suffer personal injury, including loss of employment, lost wages, lost benefits, loss of reputation within the community, and physical and emotional distress among other losses and injuries described herein, in amounts to be determined at trial.

214.    Defendants' discriminatory and pretextual actions and inactions were taken with reckless indifference to Plaintiffs' legal rights entitling them to punitive damages under the NYSHRL against each of the CVS corporate Defendants.

## THIRD CLAIM AGAINST DEFENDANTS

### (Disparate Treatment Because of Gender/Sex under
### Title VII & NYSHRL against CVS corporate Defendants)

215.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through **
as if set forth herein.

216.     Plaintiffs are "persons" and "employees" within the meaning of Title VII and the
NYSHRL.

217.     Defendants are "employers" within the meaning of Title VII and the NYSHR.

218.     By their actions as detailed above, Defendant employers individually and jointly
unlawfully discriminated against Plaintiffs because of their gender/sex by treating Plaintiffs
differently from others similarly situated because of their gender/sex.

219.     As a result of the unlawful actions and inactions described herein, Plaintiffs were
injured, suffered, and continue to suffer personal injury, including loss of employment, lost
wages, lost benefits, loss of reputation within the community, and physical and emotional
distress among other losses and injuries described herein, in amounts to be determined at trial.

220.     Defendants' discriminatory and pretextual actions and inactions were taken with
reckless indifference to Plaintiffs' legal rights entitling them to punitive damages under the
NYSHRL against each of the CVS corporate Defendants.

## FOURTH CLAIM

### (Deprivation of Civil Rights under 42 U.S.C. § 1983 against Defendant Carpenter)

221.     Plaintiffs reassert and reallege the allegations set forth in Paragraphs 220 as if set
forth herein.

222.     Plaintiffs are "persons" and "citizens of the United States" within the meaning of
Title VII.

223.    At all relevant times, Defendant Chief Jeffrey Carpenter was a person "acting under color of law" within the meaning of applicable laws.

224.    At all relevant times, Defendant Carpenter was a policy maker for the Village of Pelham Manor Police Department.

225.    Defendant Carpenter unlawfully deprived Plaintiffs of their right to employment, expected future earnings, and other losses and injuries as described herein, by continually complaining about Plaintiffs because of their gender/sex, including about the number of their shoplifting incident calls to PMPD, and about their alleged inability to represent and manage CVS store 1959 because of their gender/sex.

226.    As a result of the unlawful actions and inactions described herein, Plaintiffs were injured, suffered, and continue to suffer personal injury, including loss of employment, lost wages, lost benefits, loss of reputation within the community, and physical and emotional injuries and distress among other losses and injuries described herein, in amounts to be determined at trial.

227.    Defendant Carpenter's discriminatory conduct was taken with reckless indifference to Plaintiffs' legal rights entitling them to punitive damages under all applicable laws.

## FIFTH CLAIM AGAINST DEFENDANT VILLAGE OF PELHAM MANOR
### (Deprivation of Civil Rights under 42 U.S.C. § 1983)

228.    Plaintiffs reassert and reallege the allegations set forth in Paragraphs 227 as if set forth herein.

229.    Plaintiffs are "persons" and "citizens of the United States" within the meaning of all applicable laws.

230.     At all relevant times, Defendant Village of Pelham Manor was "acting under color of law" within the meaning of all applicable laws and employed Defendant Jeffrey Carpenter as Chief of PMPD.

231.     Defendant Village and PMPD unlawfully deprived Plaintiffs of their right to employment and expected future earnings by hiring and maintaining Defendant Carpenter as Chief of Police despite its knowledge of his discriminatory actions and inactions concerning Plaintiffs because of their gender/sex.

232.     Defendant Village and PMPD unlawfully deprived Plaintiffs of their right to employment and expected future earnings by failing to train and/or supervise Defendant Carpenter as Chief of Police despite its knowledge of his discriminatory actions and inactions concerning Plaintiffs because of their gender/sex.

233.     As a result of the unlawful actions and inactions described herein, Plaintiffs were injured, suffered, and continue to suffer personal injury, including loss of employment, lost wages, lost benefits, loss of reputation within the community, and physical and emotional injuries and distress among other losses and injuries described herein, in amounts to be determined at trial.

## SIXTH CLAIM AGAINST PMPD DEFENDANTS
### (First and Fourteenth Amendment Violations under Section 1983)

234.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs x-x as if set forth herein.

235.     Each Plaintiff is a "person" and citizen of the United States within the meaning of Section 1983.

236.     Defendants were acting under the "color of law" under the meaning of Section 1983.

237.    When they complained of suspected shoplifting activity and/or when they filed complaints with PMPD, Plaintiffs were exercising their right to petition as guaranteed by the First and Fourteenth Amendments of the United States Constitution.

238.    By their actions described herein, Defendants have discriminated and retaliated against Plaintiffs and/or unlawfully attempted to interfere with and/or prohibit Plaintiffs from exercising their right to petition in violation of the First and Fourteenth Amendments of the United States Constitution.

239.    The First Amendment right to petition is one of the "rights, privileges, or immunities secured by the Constitution and laws" within the meanings of Section 1983.

240.    As a result of the unlawful actions and inactions described herein, Plaintiffs were injured, suffered, and continue to suffer personal injury, including loss of employment, lost wages, lost benefits, loss of reputation within the community, and physical and emotional injuries and distress among other losses and injuries described herein, in amounts to be determined at trial.

## SEVENTH CLAIM AGAINST DEFENDANTS
### (Negligent Infliction of Emotional Distress)

241.    Plaintiffs repeat and reallege the allegations set forth in Paragraphs x-x as if set forth herein.

242.    Plaintiffs have experienced severe emotional and physical distress as described herein as a result of the actions and inactions of each Defendant, acting individually and jointly with each other.

243.    As a result of the unlawful actions and inactions described herein, Plaintiffs were injured, suffered, and continue to suffer personal injury, including loss of employment, lost wages, lost benefits, loss of reputation within the community, and physical and emotional

injuries and distress among other losses and injuries described herein, in amounts to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs requests that this Court enter Judgment and an Order as follows:

1.     Reinstating Plaintiffs Wellington and Cunningham to their management positions with full retroactive benefits, seniority, back pay, and award compensation for any and all other losses to make Plaintiffs completely whole.

2.     Declaring that Defendants Pimble, Prior, and Rizzo discriminated against and retaliated against Plaintiffs in the terms and conditions of their employment because of their gender/sex.

3.     Declaring that the CVS corporate Defendants unlawfully failed to protect Plaintiffs against discrimination because of their gender/sex by Defendants Carpenter and Village.

4.     Declaring that Defendants Pimble, Prior, and Rizzo unlawfully failed to protect Plaintiffs against discrimination because of their gender/sex by Defendants Carpenter and Village.

5.     Declaring that Defendants Pimble, Prior, and Rizzo unlawfully participated in and/or intentionally facilitated unlawful discriminatory actions and inactions because of their gender/sex by Defendants Carpenter and Village.

6.     Awarding Plaintiffs punitive damages as permissible under the applicable laws cited herein.

7.    Enjoining Defendants from any further discriminatory or unlawful actions or inactions against Plaintiffs because of their gender/sex.

8.    Require the CVS Defendants to engage in gender/sex discrimination training for all supervisors and managers of the individual CVS stores' managers and employees.

9.    Awarding Plaintiffs all attorneys' fees and costs.

10.   Awarding Plaintiffs such other further relief as the Court may deem is just and proper.

Dated: February 16, 2023
        New York, New York

ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS
*Attorneys for Plaintiffs Regina Cunningham
and Stacey Wellington*

 /s/ *Laura Dawn Barbieri*
Laura Dawn Barbieri
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400, 712
(914) 819-3387
lbarbieri@advocatesny.com