UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REGINA CUNNINGHAM and STACEY
WELLINGTON,

                                        Plaintiffs,

        -against-

CVS HEALTH CORPORATION, CVS
PHARMACY INC., VILLAGE OF PELHAM
MANOR, and RONALD RIZZO, SHANNON
PRIOR, CHRISTOPHER PIMBLE, and
JEFFREY CARPENTER, *in their respective
individual and official capacities*,

                                        Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 06/04/2024

No. 23-cv-1328 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiffs Regina Cunningham and Stacey Wellington bring this action against Defendants CVS Health Corporation, CVS Pharmacy Inc. (together, "CVS"), Ronald Rizzo, Shannon Prior, and Christopher Pimble (collectively with CVS, the "CVS Defendants"); Village of Pelham Manor (the "Village") and Jeffrey Carpenter ("Carpenter") (together, the "Village Defendants") (the CVS Defendants together with the Village Defendants, "Defendants"). Plaintiffs assert claims for (1) gender/sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17; (2) gender/sex discrimination in violation of the New York State Human Rights Laws ("NYSHRL"), N.Y. Exec. Law §§ 290 to 297; (3) violations of their constitutional and civil rights pursuant to 42 U.S.C. § 1983 ("Section 1983"); and (4) negligent infliction of emotional distress. ("Compl.," ECF No. 1.)

Presently before the Court are (1) the CVS Defendants' Motion to Compel Arbitration and Dismiss the Action (ECF No. 54); (2) the Village's Motion to Dismiss (ECF No. 48); and (3) Carpenter's Motion to Dismiss (ECF No. 45). For the reasons stated below, the Court grants the CVS Defendants' motion to compel arbitration and the Village Defendants' motions to dismiss.

1

## BACKGROUND

Unless otherwise noted, the facts are drawn from Plaintiffs' Complaint or from documents incorporated by reference,[1] and are accepted as true for the purposes of Defendants' motions.

CVS employs individuals to work at their retail stores, including CVS Pharmacy Store 1959 (the "CVS Store") located in the Village of Pelham Manor (the "Village"). (Compl. ¶¶ 76, 91.) The CVS Store is located in a business zone policed by the Pelham Manor Village Police Department ("PMPD"). (*Id.* ¶¶ 7, 16.) At all relevant times, Defendant Jeffrey Carpenter served as police chief of the PMPD. (*Id.* ¶¶ 13-14.) In 2019, property crime, such as shoplifting, burglaries, and other non-violent crimes, accounted for 96% of all offenses in the Village. (*Id.* ¶¶ 8-10.) The CVS Store had the highest or one of the highest shoplifting incidents in the Village. (*Id.* ¶ 20.)

Cunningham and Wellington both worked as store managers at the CVS Store. (*Id.* ¶ 16.) Plaintiffs did their jobs as store managers "too well"—Plaintiffs made a steady stream of calls to PMPD to report suspected shoplifting activity and reported the highest number of suspected shoplifting incidents in the Village. (*Id.* ¶¶ 19, 23.) As an example, in 2019 and 2020, Wellington called PMPD more than 30 times to report suspected shoplifting activity at the CVS Store. (*Id.* ¶¶ 20-21.) Plaintiffs further allege that these high number of shoplifting reports negatively affected both the Village by increasing the PMPD's crime statistics—which caused PMPD to appear ineffective and Defendant Village to appear unsafe—and Carpenter by causing his leadership to appear ineffective. (*Id.* ¶¶ 25-26.) Plaintiffs' steady stream of calls to PMPD were a continuing source of embarrassment for Carpenter. (*Id.* ¶ 19.)

---

[1] The Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *GE Transportation Parts, LLC v. Cent. Ry. Mfg., LLC*, 468 F. Supp. 3d 607, 614 (S.D.N.Y. 2020) (citing *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

Plaintiffs' high volume of reports caused Carpenter to repeatedly call CVS's corporate office—including calls to Defendants Chris Pimble and Shannon Prior—to complain about Plaintiffs and their reporting of suspected shoplifting. (*Id.* ¶ 26.) Pimble served as the Loss Prevention Manager and Prior served as the Regional Asset Protection Manager for CVS. (*Id.* ¶ 75.) During the phone calls to CVS corporate, Carpenter used discriminatory and stereotypical language by referring to Plaintiffs as "girls, women, or ladies," voicing concerns about Plaintiffs' safety, and by alleging or implying the CVS Stores's "all-women" or "all-girl" staff was ineffective or unsafe because they were female. (*Id.* ¶¶ 27, 45, 49.) Motivated by Plaintiffs' gender/sex, Carpenter (1) recommended the CVS Defendants speak with Plaintiffs to discourage, reprimand, or discipline Plaintiffs for making too many shoplifting calls to PMPD; (2) advocated the CVS Defendants install security cameras and/or hire security guards "to protect 'the girls'"; (3) complained about the alleged absence of sufficient safety measures for the CVS Store; and (4) attributed the high volume of suspected shoplifting activity at the CVS Store to Plaintiffs' gender/sex. (*Id.* ¶¶ 28-31, 46-47.) Plaintiffs allege that Carpenter "engaged in a discriminatory campaign to get rid of Plaintiffs, both of whom he derogatorily and continually referred to as girls." (*Id.* ¶ 48.) After Carpenter began calling CVS, Pimble allegedly began to investigate and single out Plaintiffs. (*Id.* ¶ 104.)

On April 9, 2020, Plaintiffs reported suspected shoplifting activity to the PMPD after they observed a man enter the CVS store, fill his bag with CVS merchandise, spit on them when they engaged with him, and then leave the store without paying. (*Id.* ¶¶ 112-123.) After the incident, Wellington left the building to recover from the confrontation, and while outside the building flagged down the police. (*Id.* ¶ 119.) Cunningham also left the building to check on Wellington. (*Id.* ¶ 126.) On June 12, 2020, Defendant Ronald Rizzo, a District Manager of CVS who was

responsible for the CVS Store, came to the store, and issued Plaintiffs a final warning prior to termination for leaving the building during a shoplifting incident. (*Id.* ¶¶ 100, 124.) Plaintiffs allege they were singled out and terminated because of their gender and sex due to the pressure the CVS Defendants individually and collectively received from PMPD, notably Carpenter, about their reporting of suspected shoplifting activity. (*Id.* ¶114.)

On December 24, 2020, Cunningham reported suspected shoplifting to the PMPD after observing a known shoplifter enter the store, take CVS merchandise, and leave without her seeing the customer/suspect pay for his items. (*Id.* ¶¶ 145-147.) The PMPD stopped a person matching the suspect's description, searched his bag, and found a sales receipt that seemingly confirmed that the items were purchased at a different retail store. (*Id.* ¶¶ 148, 153.) The PMPD thereafter allowed the person to leave. (*Id.*) On January 6, 2021, Carpenter called Pimble to discuss his concerns regarding larceny and Plaintiffs' multiple calls for service, including the incident on December 24, 2020. (*Id.* ¶ 155.) Carpenter's January 6, 2021 complaint was at least the third complaint against Plaintiffs and their reporting of suspected shoplifting. (*Id.* ¶ 158.) As a result of Carpenter's call, Pimble agreed to visit and evaluate the CVS Store and Plaintiffs. (*Id.* 156-157.)

On January 12, 2021, Pimble and Prior met individually with each Plaintiff to discuss the December 24, 2020 incident and accused both Plaintiffs of violating the CVS Asset Protection Policy and Shoplifting Apprehension Guidelines. (*Id.* ¶¶ 159-166.) At the end of those meetings, Plaintiffs were suspended from employment pending review of the incidents. (*Id.* ¶ 166.) On January 14, 2024, Plaintiffs were terminated. (*Id.* ¶ 176.)

The CVS Defendants allegedly acted in concert with the Village Defendants, both of whom sought adverse employment actions against Plaintiffs because they exercised their First Amendment rights by complaining about and reporting suspected shoplifting activity. (*Id.* ¶ 199.)

Specifically, Plaintiffs allege that due to Carpenter's complaints regarding their gender/sex, the CVS Defendants investigated Plaintiffs' reporting of suspected shoplifting activity, and ultimately disciplined and terminated Plaintiffs. (*Id.* ¶¶ 32-37.) Plaintiffs further allege that their alleged violations of the CVS policies were only a pretextual reason for their terminations, and the CVS Defendants sought to "get rid of" Plaintiffs and placate the PMPD. (*Id.* ¶ 32-37, 56-57.) As a result of their treatment, Plaintiffs suffered physical and emotional distress.

## LEGAL STANDARDS

### I.    Motion to Compel Arbitration

When deciding whether to compel arbitration, courts consider whether (1) the parties agreed to arbitrate and (2) the arbitration agreement includes the disputed claim or claims. *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015). According to the Supreme Court, the Federal Arbitration Act ("FAA")[2] "embodies [a] national policy favoring arbitration." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). Due to the "strong federal policy in favor of arbitration, the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if 'it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) (quoting *Associated Brick Mason Contractors of N.Y., Inc. v. Harrington*, 820 F.2d 31, 35 (2d Cir.1987)) (citation omitted).

Courts are required to analyze a motion to compel arbitration under a standard similar to that applied to motions for summary judgment; if there is a genuine issue of fact surrounding the purported agreement to arbitrate, the court cannot compel arbitration. *Kutluca v. PQ N.Y. Inc.*, 266

---

[2] Parties do not dispute that the FAA applies.

F. Supp. 3d 691, 700 (S.D.N.Y. 2017) (citing *Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). "A party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010).

## II.    Motion to Dismiss

Under Rule 12(b)(6), the inquiry is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Id.* at 662. A claim is facially plausible when the factual content pleaded allows a court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## DISCUSSION

Plaintiffs assert claims for (1) gender/sex discrimination under Title VII and the NYSHRL

against CVS; (2) gender/sex discrimination under Section 1983 against the Village Defendants; (3) discrimination, retaliation, and interference in the right to petition in violation of the First and Fourteenth Amendments against the Village Defendants;[3] and (5) a state law claim for negligent infliction of emotional distress against all Defendants. (Compl. ¶¶ 202-243.)

The CVS Defendants move to compel arbitration of Plaintiffs' claims and the Village Defendants each move to dismiss Plaintiffs' Complaint in its entirety. The Court first considers the CVS Defendants' motion, before turning to the Village Defendants' motions.

**I.    The CVS Defendants' Motion to Compel Arbitration**

The CVS Defendants seek an Order (1) compelling Plaintiffs to arbitrate their claims against the CVS Defendants; (2) dismissing the action pursuant to the FAA and Rules 12(b)(1) and 12(b)(6); and (3) awarding the CVS Defendants attorneys' fees and costs associated with the instant motion.[4] (CVS Def. Mem. at 1.)

For the reasons articulated below, the Court concludes that Plaintiffs entered into a valid arbitration agreement with the CVS Defendants and that the agreement applies to Plaintiffs' claims.

*A.   The Court May Not Consider the Bailey Affidavit*

Plaintiffs ask the Court to reject the Affidavit of Robert Bailey submitted by the CVS Defendants in support of their motion. Plaintiffs contend that the Bailey Affidavit fails to satisfy

---

[3] Plaintiffs' Sixth Cause of Action in their Complaint is asserted against the "PMPD Defendants." (Compl. ¶¶ 234-240.) Plaintiffs do not define "PMPD Defendants" in their Complaint, but in their Opposition to the Village's and Carpenter's motions to dismiss, they identify the PMPD Defendants as the Village and Carpenter. (Pl. MTD Opp. at 1.)

[4] The CVS Defendants fully briefed their motion on January 19, 2024: Motion to Compel Arbitration (ECF No. 54); Memorandum of Law in Support ("CVS Def. Mem.," ECF No. 57); Affidavit of Jennifer Y. Davis in Support ("Davis Aff.," ECF No. 55); Affidavit of Robert Bailey in Support ("Bailey Aff.," ECF No. 56); and Reply Memorandum of Law ("Reply," ECF No. 58). In opposition, Plaintiffs filed their Memorandum of Law in Opposition ("Pl. Arb. Opp.," ECF No. 61); Declaration of Stacey Wellington in Opposition ("Wellington Decl.," ECF No. 59); and Declaration of Regina Cunningham in Opposition ("Cunningham Decl.," ECF No. 60). Citations to "CVS Def. Ex." refer to the exhibits attached to the Davis Affidavit.

the requirements for an unsworn statement under 28 U.S.C. § 1746 because Bailey attests he is "aware" that if any of his statements are false he is "subject to punishment." (Pl. Arb. Opp. at 11.) Plaintiffs are correct that the verification on Bailey's Affidavit is insufficient, and therefore the Court declines to consider Bailey's unsworn statements. However, the Court does consider the Arbitration Materials submitted with Bailey's Affidavit and Davis's Affidavit. The Arbitration Materials include: (1) Arbitration of Workplace Legal Disputes Policy (the "Policy" or "Arbitration Agreement"); (2) Arbitration of Workplace Legal Disputes (Course No. 800305) (the "Training Course"); and (3) CVS Health Colleague Guide to Arbitration (the "Guide"). *See infra* Section I.B.

Section 1746 provides that an unsworn statement may be treated as sworn if "prove[n] by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as trust under penalty of perjury, and dated, in substantially the [] form" of the model declaration provided in the statute. 28 U.S.C.§ 1746. As Plaintiffs assert, Section 1746 "requires that a certification of the truth of a matter be expressly made under penalty of perjury." *In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013). The language "subject to punishment" will not suffice as it is "a substantial departure from the substance of the declaration provided in § 1746." *Id.* Accordingly, the Court may not consider the statements made by Bailey in his unsworn declaration.

That said, the Court will consider the Arbitration Materials in determining whether to grant the CVS Defendants' motion to compel arbitration. First, the Arbitration Materials were attached not only to Bailey's improper unsworn declaration but also to Davis's proper unsworn declaration. Therefore, the Court has the Arbitration Materials in two different forms, and they are substantially the same and contain identical language. Second, and most significantly, Plaintiffs appear to

concede that the Arbitration Materials are the operative documents. Through their properly sworn declarations, Plaintiffs do not dispute that the Policy, the Guide, and the Training Course are the materials they received when signing the Policy. (*See, e.g.*, Cunningham Aff. ¶ 5 ("[T]he policy was presented as a 'training module.'"); ¶ 9 ("I read the information in the module"); ¶ 18 ("I also really don't recall whether this was the only module completed that day . . .").) Nor did Plaintiffs' counsel challenge the Arbitration Materials as the controlling documents when they received them from the CVS Defendants via email. (*See* CVS Def. Ex. 4.) Likewise, Plaintiffs fail to challenge the Arbitration Materials in their Opposition. (*See generally*, Pl. Arb. Opp.)

Instead of challenging whether the Arbitration Materials are the controlling documents, Plaintiffs claim they neither understood nor fully agreed to the Policy. (Cunningham Aff. ¶ 5 ("I was deceived by CVS regarding the *import* of the material I received from the company."); ¶ 17 (asserting they "did not 'sign'" any agreements but rather were "obligated to click through the information on the screen"); ¶¶ 19-20 (identifying and challenging language within the policy).) Plaintiffs claim that the Policy is invalid, unenforceable, and unconscionable. Ergo, the Court will consider the Arbitration Materials in assessing the merits of those arguments below.

### B.  The Arbitration Agreement

In October 2014, CVS adopted its Arbitration of Workplace Legal Disputes Policy (the "Policy" or "Arbitration Agreement"), pursuant to which CVS and participating employees "implement[ed] an arbitration program for the resolution of workplace legal disputes." (*See* CVS Def. Ex. 2 at 12-15.) The Arbitration Agreement reads, in pertinent part:

**SCOPE**

This Policy applies to and forms a mutually-binding contract between CVS Health and all of its employees, except those employees subject to a collective bargaining agreement ("CBA") unless the CBA contains language recognizing the applicability of policies like this one. Covered employees are referred to in this policy as "Employee" or "Employees."

1. **Mutual Obligation to Arbitrate.** Under this Policy, CVS Health (including its subsidiaries) and its Employees agree that any dispute between an Employee and CVS Health that is covered by this Policy ("Covered Claims") will be decided by a single arbitrator through final and binding arbitration only and will not be decided by a court or jury or any other forum, except as otherwise provided in this Policy. This Policy is an agreement to arbitrate disputes covered by the Federal Arbitration Act (9 U.S.C. §§ 1-16). Employees accept this Policy by continuing their employment after becoming aware of the Policy.

2. **Claims Covered by this Policy.** Except as otherwise stated in this Policy, Covered Claims are any and all legal claims, disputes or controversies that CVS Health may have, now or in the future against an Employee or that an Employee may have, now or in the future, against CVS Health, its parents, subsidiaries, successors or affiliates, or one of its employees or agents, arising out of or related to the Employee's employment with CVS Health or the termination of the Employee's employment.

   Covered Claims include but are not limited to disputes regarding wages and other forms of compensation, hours of work, meal and rest break periods, seating, expense reimbursement, leaves of absence, harassment, discrimination, retaliation and termination arising under the Civil Rights Act of 1964, Americans with Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act . . . and other federal, state and local statutes, regulations and other legal authorities relating to employment. Covered claims also include disputes arising out of or relating to the validity, enforceability or breach of this Policy . . . .

(*Id.* at 12-13.) The CVS Defendants argue that CVS also offered employees a training course on its arbitration policy titled Arbitration of Workplace Legal Disputes (Course No. 800305) (the "Training Course"). (*See id.* at 16-22.) The Training Course required employees to read the CVS Health Colleague Guide to Arbitration (the "Guide"). (*Id.* at 4-11.) The Guide explained the arbitration process to employees, their rights under the Policy, and instructions on how to opt out of the Policy. Relevant here, the Guide provides:

**Colleagues' Rights**

Arbitration is a matter of contract between the colleague and CVS Health. Colleagues accept the policy by continuing their employment with CVS Health after becoming aware of the policy. With that being said, we want colleagues' participation to be voluntary. Colleagues will be asked to acknowledge and agree to the policy, but from the time that a colleague first views or receives the policy, he or she has thirty days to opt out of the policy. If a colleague opts out, he or she will not be obligated to go to arbitration and can continue to use the traditional court system as before. Likewise, if a colleague opts out, CVS Health

will not be required to arbitrate any disputes it has with that colleague.

**How to Opt Out**

In order to opt out, a colleague must mail a written, signed and dated letter stating clearly that he or she wishes to opt out of the CVS Health Arbitration of Workplace Legal Disputes Policy. The letter must be mailed to CVS Health, P.O. Box 969 Woonsocket, RI 02895. In order to be effective, the colleague's opt out notice must be postmarked no later than 30 days after the date the colleague first views or receives the policy. Please note, sending in a timely notice is the only way to opt out. A colleague cannot opt out by refusing to complete training or attend meetings about the policy.

(*Id.* at 7.) Upon reviewing the Guide, employees had to return to the Training Course to click the "YES" button to confirm their acknowledgment and agreement to various statements, including:

- that I have carefully read [the Policy] and understand that it applies to me;

- that I will raise any questions I may have about the Policy to my supervisor or Human Resources and may seek independent legal advice as well;

- that I have the opportunity, for a limited time only, to opt out of the Policy and, by doing so, not be bound by its terms;

- that being covered by the Policy and not opting out, I and CVS are obligated to go to arbitration instead of court to resolve legal claims covered by the policy; . . .

(*Id.* at 16, 21.) Finally, the CVS Defendants also submitted "an official authorized training record and proof of completion" for Cunningham and Wellington which shows they completed the Training Course on October 20, 2014 and October 5, 2015, respectfully. (*Id.* at 23-24.)

### C.  The Arbitration Agreement is a Valid Contract

Plaintiffs argue the Policy is void as against public policy. In 2016, the NLRB issued a decision (the "Decision") finding that Respondents CVS RX Services, Inc. ("CVS RX") and CVS Pharmacy, Inc. ("CVS Pharmacy") violated Section 8(a)(1) of the National Labor Relations Act ("NLRA") "by maintaining an arbitration program that requires employees, as a condition of employment, to raise the right to maintain class or collective actions. . . ." *CVS Rx Servs., Inc. &*

*CVS Pharmacy, Inc. & Kenneth Sternfeld*, 363 NLRB 1754, 1754 (2016). In the decision, the NLRB ordered CVS RX and CVS Pharmacy to "cease and desist" from "implementing and maintaining" a mandatory arbitration program that included a class action waiver. *Id.* The NLRB further directed them to rescind or revise the Arbitration Agreement, the Training Course, and the Guide and to provide all affected employees notice of the rescission or copies of the revised documents. *Id.*

Plaintiffs argue that this decision "invalidated the entire policy at issue and required CVS to notify all affected employees that the entire agreement was determined invalid." (Pl. Arb. Opp. at 3.) Plaintiffs further contend that CVS failed to provide them such notice. (*Id.*) The Court, however, does not interpret the Decision to invalidate the entire Arbitration Agreement. The Decision clearly provides that CVS RX and CVS Pharmacy could cure the violations of the NRLA by revising the Arbitration Materials to "make clear to employees" that they did not waive their right to collective action under the arbitration program. *CVS Rx Servs., Inc.*, 363 NRLB at 1755. The NLRB therefore held that the class action waiver provision, rather than the entire Policy itself, violated the NLRA. Moreover, Plaintiffs cite no legal authority to support their position that an NLRB Decision that invalidated the class action waiver of an arbitration program rendered the entire arbitration agreement unenforceable.

Moreover, the Arbitration Agreement includes a severability clause which provides that "if any portion of this Policy is adjudged to be unenforceable, the remainder of this Policy will remain valid and enforceable." (CVS Def. Ex. 2 at 15.) "Both case law and the NLRB favor severing a violative contractual provision." *Doheny v. Int'l Bus. Machines, Corp.*, No. 23-CV-3962 (RA), 2024 WL 382142, at *13 (S.D.N.Y. Feb. 1, 2024) (citing *Ragone v. Atl. Video at Mangattan Ctr.*, 595 F.3d 115, 124 (2d Cir. 2020)). The Court therefore declines to render the entire Arbitration

Agreement null and void due to the NLRB's Decision.

### D.  *Plaintiffs Agreed to Arbitrate*

The Court must now consider whether Plaintiffs and the CVS Defendants agreed to arbitrate. In opposing arbitration, Plaintiffs argue the Arbitration Agreement is unconscionable because Plaintiffs are "unsophisticated employees completely dependent on their employer for their livelihood as well as on the employer's explanation for the contents and meaning of the agreement they were being coerced to acknowledge." (Pl. Arb. Opp. at 9.) Plaintiffs further argue that the Arbitration Agreement includes "a forced arbitration clause with several unconscionable terms," such as "giving CVS the authority and power to change the terms of the clause unilaterally, to drastically limit discovery, and to impose prohibitive costs on employees like Plaintiffs." (*Id.* at 9-10.) The Court is unpersuaded by Plaintiffs' arguments.

Unconscionability implicates the first prong of an analysis for a motion to compel arbitration: whether the parties to an agreement actually agreed to arbitrate. Under New York law,[5] an arbitration clause is unconscionable if it is "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible [sic] according to its literal terms." *Nayal v. HIP Network Serv. IPA, Inc*., 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009) (quoting *Gillman v. Chase Manhattan Bank, N.A.,* 534 N.E.2d 824, 828 (N.Y. 1988)) (internal quotation mark omitted).

Generally, a plaintiff must show that an agreement is both procedurally and substantively unconscionable. *Nayal*, 620 F. Supp. 2d at 573; *see Ragone*, 595 F.3d at 122 (noting that a finding of unconscionability usually requires that both the procedural and substantive components are presented and that only in exceptional circumstances will a contract be unenforceable based solely

---

[5] The parties do not dispute that New York law governs the Policy. (Pl. Arb. Opp. at 8 n.3.)

on substantive unconscionability). Courts should consider all facts and circumstances in determining whether a contract is unconscionable. *In re Estate of Friedman*, 407 N.Y.S.2d 999, 1008 (2d Dep't 1978). However, "[a]bsent substantive unconscionability or fraud . . . , parties are charged with knowing and understanding the contents of documents they knowingly sign." *Horvath v. Banco Comercial Portugues, S.A.*, 461 F. App'x 61, 63 (2d Cir. 2012).

      1.  Procedural Unconscionability

A contract is procedurally unconscionable if the circumstances surrounding the formation of the contract show that the party alleging unconscionability lacked meaningful choice. *Nayal*, 620 F. Supp. at 571. Plaintiffs argue that the Court should void the Policy as unconscionable because of the "unequal bargaining power" and "coercive methods" used by the CVS Defendants. (Pl. Arb. Opp. at 9.) In their Declarations, Plaintiffs generally maintain that (1) they did not understand the terms and implications of the Policy (*See* Wellington Aff. ¶¶ 5-7; Cunningham Aff. ¶¶ 5-7); (2) completion of the training was a condition of continued employment (*id.* ¶¶ 9, 12, 13, 17); and (3) Plaintiffs felt "pressured" and "stressed" to complete the training modules (*id.* ¶¶ 10-11). According to Plaintiffs, "Finished didn't mean agree. Finished meant finished." (*Id.* ¶ 10.) The Court finds that Plaintiffs fail to demonstrate a lack of meaningful choice.

As a threshold matter, "[c]ourts applying New York law have considered an opt-out provision as an important, if not dispositive, factor in rejecting challenges of procedural unconscionability." *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 730-31 (E.D.N.Y. 2017) (collecting cases). Here, Plaintiffs appear to conflate the Training Course explaining the Policy with the Policy itself. Throughout their declarations, Plaintiffs assert they were under pressure to complete the training course and had to complete the course or quit. (Cunningham Aff. ¶¶ 9-12, 17-18; Wellington ¶¶ 9-12, 17-18.) However, Plaintiffs did not consent to the Policy by

completing the Training Course, but rather by continuing their employment and failing to opt out within 30 days. CVS used the Training Course as a mechanism to explain the arbitration process and inform employees, including Plaintiffs, of their rights and obligations under the Policy. Plaintiffs take issue with the Policy being presented as a "training module," and claim that they did not understand that it was a legally binding agreement. (Cunningham Aff. ¶ 5; Wellington ¶ 5.) Yet the Policy itself, the Guide that Plaintiffs were required to acknowledge they read prior to completing the Training Course, and the statements Plaintiffs acknowledged and agreed to at the end of the Training Course all make this clear.

Both the Training Course and the Guide expressly informs Plaintiffs of their right to opt out and provides clear instructions on how to do so. The Guide—which Plaintiffs acknowledged they read when completing the Training Course—explicitly states that employees can opt out of the policy within 30 days and if they do opt out, they "will not be obligated to go to arbitration and can continue to use the traditional court system as before." (CVS Def. Ex. 2 at 10.) The Guide further states "[a]rbitration is a matter of contract between the colleague and CVS Health." (*Id.*) These terms are reiterated on the "Acknowledgment" page of the Training Course—that both Plaintiffs signed—which explicitly states that Plaintiffs "understand [the Policy] applies to [them]" and they may "opt out of the Policy and . . . not be bound by its terms." (*Id.* at 16.) Furthermore, the Policy does not require an employee to opt in to remain employed.[6]

To circumvent the plain language of the Arbitration Materials, Plaintiffs assert that they did not understand the terms of the Policy. However, "[w]hen a party signs a contract, they are presumed to have assented to its contents[.]" *Ciago v. Ameriquest Mortg. Co.*, 295 F. Supp. 2d

---

[6] Even if opting in to the Policy was a condition of employment, this alone would be insufficient to invalidate the agreement. *Clinton v. Oppenheimer & Co. Inc.*, 824 F. Supp. 2d 476, 483 (S.D.N.Y. 2011) ("It is well-settled that conditioning employment on the acceptance of an agreement to arbitrate disputes, including those under civil rights laws, is not itself unlawfully coercive.") (cleaned up) (collecting cases).

324, 329 (S.D.N.Y. 2003) (citing *Arakawa v. Japan Network Group,* 56 F.Supp.2d 349, 352 (S.D.N.Y.1999)). Plaintiffs' basic misunderstanding of the Arbitration Materials—which clearly explains the arbitration process, outlines their rights, and instructs them on how to opt out—does not render the Arbitration Agreement unenforceable. *Horvath*, 461 F. App'x at 63 ("[P]arties are charged with knowing and understanding the contents of documents they knowingly sign."); *De Jesus v. Gregorys Coffee Mgmt., LLC*, No. 20CV6305MKBTAM, 2022 WL 4229331, at *8 (E.D.N.Y. June 9, 2022), *report and recommendation adopted*, No. 20CV6305MKBTAM, 2022 WL 3097883 (E.D.N.Y. Aug. 4, 2022) ("A misunderstanding, or lack of inquiry, regarding the nature of a contract is not enough to prove procedural unconscionability."); *see also Ragone*, 595 F.3d at 122 (2d Cir. 2010) (finding arbitration agreement not procedurally unconscionable even though employee-signatory did not have a college degree or any experience in business).

Plaintiffs also lean into the "unequal bargaining power" between themselves as "unsophisticated employees" and CVS as their employer. Although "there often will be unequal bargaining power between employers and employees[,] . . . [m]ere inequality in bargaining power, however, is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context." *Ciago*, 295 F. Supp. 2d at 329 (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S. Ct. 1647, 1655, 114 L. Ed. 2d 26, 33 (1991)). That said, inequality in bargaining power coupled with "high pressure tactics that coerce a signatory's acceptance of onerous terms" may, however, constitute procedural unconscionability. *Clinton v. Oppenheimer & Co. Inc.*, 824 F. Supp. 2d 476, 483 (S.D.N.Y. 2011). "Such improper tactics may include[] pressuring the prospective employee to sign the agreement without reading it, refusing to let her review the agreement with an attorney, or deceiving her as to its content." *Id.*

Plaintiffs fail, however, to demonstrate the CVS Defendants used such tactics. Plaintiffs'

Opposition certainly does not make the argument, and their Declarations are unpersuasive as well. Other than feeling pressured to complete the Training Course and review the Guide during work hours, Plaintiffs do not allege that they felt "stressed" or "pressured" to not opt out of the Policy. Requiring Plaintiffs to complete the Training Course and pressuring them to do so is not a "high-pressure tactic" when there exists a meaningful opportunity to opt out. *See, e.g.*, *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 711, 732 (E.D.N.Y. 2017) (incentivizing plaintiffs to quickly agree to terms of service that included an arbitration agreement did not "transform" the defendant's request into "'high pressure tactics.'"). Moreover, while Plaintiffs allege they did not receive any physical copies of the Policy, they do not allege that they did not receive *any* copies of the Policy, and the Guide even suggests that an electronic copy was made available to all employees. (CVS Def. Ex. 2 at 8 ("A copy of [the Policy] can be found on the Policy and Procedure Portal via myLife.").) Nowhere do Plaintiffs allege or even imply that once they hit the "YES" button to confirm their acknowledgment that CVS completely withheld the Policy from them and hindered their ability to opt out within the deadline.

Plaintiffs further assert that there was no discussion or opportunity to discuss the Policy, no opportunity to take notes, and no opportunity to bargain or negotiate the terms of the agreement. (Wellington Aff. ¶ 7; Cunningham Aff. ¶ 7.) They also assert that they were "not advised" to consult an attorney within the opt-out period. (*Id.*) Again, these conclusory statements are insufficient to establish procedural unconscionability. Plaintiffs do not allege that the CVS Defendants prohibited them from taking notes or discussing the Policy with their supervisor or an attorney, or at minimum, that Plaintiffs even tried to do so. Plaintiffs thus have presented no evidence of "high pressure tactics or any other form of coercion." *Nayal*, 620 F.Supp.2d at 572; *see Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 409 (S.D.N.Y. 2021) (noting that "courts have

found that the pressure to sign documents quickly is insufficient to establish unconscionability.")
(citation and internal quotations omitted).

Finally, the cases cited by Plaintiffs are distinguishable because they all involved evidence
of actual or potential coercion, abuse, or deception. *See Jimenez v. Menzies Aviation Inc*, No. 15-
CV-02392-WHO, 2015 WL 4914727, at *5 (N.D. Cal. Aug. 17, 2015) (arbitration policy
unenforceable because defendants failed to inform putative class action members of the effect of
the policy on their claims and give them a reasonable opportunity to opt out); *Billingsley v. Citi
Trends, Inc.*, 560 F. App'x 914, 919 (11th Cir. 2014) (affirming the district court's finding that the
arbitration agreement's rollout was "calculated to reduce or eliminate the number of collective
action opt-in Plaintiffs," "replete with deceit," and "designed to be intimidating and coercive");
*Tomkins v. Amedisys, Inc.*, No. 3:12-CV-01082-WWE, 2014 WL 129401, at *2 (D. Conn. Jan. 13,
2014) (granting plaintiff's motion for a protective order because the arbitration agreement "may
be confusing, misleading, and one-sided" and finding it "troubling" the defendant unilaterally
issued a self-executing arbitration agreement substantively affecting the rights of putative class
members).

Accordingly, the Court concludes that Plaintiffs have failed to establish the Arbitration
Agreement is procedurally unconscionable.

2. Substantive Unconscionability

In the absence of procedural consciability, it is only in "exceptional cases where a
provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of
substantive unconscionability alone." *Ragone*, 595 F.3d at 122 (citing *Gillman*, 534 N.E.2d at
829). A contract is substantively unconscionable if the terms unreasonably favor the opposing
party. *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir.1999). Even when

an agreement "concededly favors" the party requesting arbitration, the arbitration agreement will be upheld if the advantage is not "grossly unreasonable." *Clinton*, 824 F.Supp.2d at 484 (collecting cases). As discussed above, Plaintiffs argue that the Arbitration Agreement includes "a forced arbitration clause with several unconscionable terms," such as "giving CVS the authority and power to change the terms of the clause unilaterally, to drastically limit discovery, and to impose prohibitive costs on employees like Plaintiffs." (Pl. Arb. Opp. at 9-10.)

Despite Plaintiffs assertions to the contrary, there is no "indication that the Arbitration Agreement provides for anything but a neutral forum." *Ciago*, 295 Supp. at 330. The Policy applies equally to CVS and their employees, including Plaintiffs, and requires both parties to submit to arbitration. As in *Ciago,* the procedural and notice rules apply equally to CVS and Plaintiffs. According to the Policy, the American Arbitration Association ("AAA") will administer the arbitration which will be conducted in accordance with AAA rules. (CVS Def. Ex. A at 3.) The parties choose the arbitrator by mutual agreement, and both parties are able to conduct discovery, file dispositive motions, be represented by counsel, and present witnesses and evidence at a hearing. (*Id.*) Finally, the location of the arbitration, unless agreed otherwise, would be within 45 miles of the place where the employee was last employed by CVS. (*Id.*)

No provision in the Policy gives CVS the unilateral authority to change the terms of the Policy, and FAA rules of discovery apply to both parties. Moreover, the Policy states that CVS will cover any costs and expenses charged by the AAA or the arbitrator, and therefore a party, including Plaintiffs, would only need to pay their own litigation costs. (*Id.* at 3.) Accordingly, the Policy does not contemplate that any costs incurred through arbitration would exceed or be any more prohibitive than costs incurred in pursuing litigation. Therefore, the Court concludes that the Policy is not substantively unconscionable.

### E.  Plaintiffs' Claims Are Covered by the Arbitration Agreement

The CVS Defendants argue that Plaintiffs' claims fall within the express terms of CVS's Arbitration Agreement. (CVS Def. Mem. at 6.) Plaintiffs do not challenge this fact.

With no arguments to the contrary, the Court must conclude that the Policy covers Plaintiffs' claims. Plaintiffs electronically signed the Policy after completing the Training Course which included a Guide that explained the meaning of arbitration, their rights under the Policy, and instructed them on how to opt out. Plaintiffs failed to opt out of the Policy within 30 days. The Policy covers "any and all legal claims, disputes . . . now or in the future" arising out of Plaintiffs' employment or the termination of their employment. (CVS Def. Ex. 2 at 12.) These claims include "harassment, discrimination, retaliation and termination arising under the Civil Rights Act of 1964 . . . and other federal, state and local statutes, regulations and other authorities relating to employment." (*Id.* at 1-2.) Undoubtedly, the Policy covers Plaintiffs' claims for discrimination, retaliation, and violations of their constitutional rights under several federal and state statutes as well as Plaintiffs' state law tort claim. [7]

### F.  A Legislative Exemption Does Not Apply

Finally, Plaintiffs argue the Policy is void as against public policy. The Court finds this argument even less convincing. On March 3, 2022, Congress invalidated pre-dispute arbitration policies covering sexual assault and sexual harassment by passing the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA"), Pub. L. No. 117-90, 136 Stat. 26, *codified at* 9 U.S.C. §§ 401-02. Plaintiffs argue their claims are not subject to arbitration pursuant to the EFAA. As a threshold matter, "[t]he EFAA applies to claims that accrued on or

---

[7] The CVS Defendants also seek to dismiss Plaintiffs' negligent infliction of emotional distress claims for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Because the Court compels arbitration of Plaintiffs' claims against the CVS Defendants, the Court declines to address this argument.

after March 3, 2022, the date of its enactment—it does not apply retroactively." *Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 180 (S.D.N.Y. 2023) (citing Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022)). As Plaintiffs concede, their claims accrued prior to March 3, 2022. (*See* Pl. MTD Opp. at 5.) Accordingly, the EFAA does not apply to Plaintiffs' claims.

The argument is problematic for other reasons. Plaintiffs contend that a complaint alleging "unwanted gender-based conduct" under the NYSHRL or the New York City Human Rights Law ("NYCHRL") fall under the EFAA. (*Id.* at 7.) However, Plaintiffs assert claims under Title VII and the NYSHRL, not the NYCHRL. As Judge Abrams observes in *Delo*, the "unwanted gender-based conduct" standard applies to NYCHRL claims, which is "the most lenient applicable liability standard." *Delo*, 685 F. Supp. 3d at 182. While Judge Abrams acknowledges that a 2019 amendment to the NYSHRL effectively "render[ed] the standard for claims under the NYSHRL closer to the standard under the NYCHRL," she does not go so far as to definitively state the standard under the NYSHRL. *Id.* She also certainly does not suggest that the lenient standard should apply to Title VII claims. Regardless, as discussed above, the EFAA does not retroactively apply to Plaintiffs' claims which accrued, at the latest, in January 2021 when they were terminated. Therefore, the Court need not determine whether Plaintiffs' claims constitute sexual harassment under either statute.

Despite Plaintiffs' attempts to render the Policy null and void through several meritless arguments, the Court finds there is a valid, enforceable arbitration agreement; Plaintiffs' claims are covered under that agreement; and no legislative exemption from arbitration applies. As "federal policy strongly favors arbitration as an alternative dispute resolution process," *Merrick v. UnitedHealth Grp. Inc.*, 127 F. Supp. 3d 138, 146 (S.D.N.Y. 2015), the Court compels Plaintiffs to submit to arbitration.

### G.  *Attorneys' Fees and Costs*

Finally, the CVS Defendants request attorneys' fees and costs on the grounds that Plaintiffs unjustifiably and unreasonably rejected their request to arbitrate pursuant to the Policy. (CVS Def. Mem. at 14.) The CVS Defendants believe costs and fees are warranted because they had advised Plaintiffs of the operative Policy and sent them copies on June 21, 2023. (Davis Aff. ¶ 4.) In response, Plaintiffs' counsel did not address the Arbitration Materials, but instead wrote that "[she] did not believe" the parties could avoid motion practice on the issue. (*Id.* ¶ 6.) For their part, Plaintiffs contend that "their sincerely held, good faith, and meritorious arguments and declarations against the CVS Defendants' motion should obviate and render inapplicable" any award of attorneys' fees. (Pl. Arb. Opp. at 13.)

This Court "may, pursuant to its inherent equitable powers, assess attorneys' fees and costs when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Marciano v. DCH Auto Grp.*, 14 F. Supp. 3d 322, 340 (S.D.N.Y. 2014) (quoting *First Nat'l Supermarkets, Inc. v. Retail, Wholesale & Chain Store Food Emps. Union Local 338*, 118 F.3d 892, 898 (2d Cir.1997)). The Court finds attorneys' fees unwarranted. While Plaintiffs' arguments are meritless, Plaintiffs advanced some legal and factual support for their claims. Furthermore, the Court recognizes the sincerity of Plaintiffs' declarations. Accordingly, the Court denies the CVS Defendants' request for attorneys' fees and costs. *Marciano*, 14 F. Supp. 3d at 340; *Josie-Delerme v. Am. Gen. Fin. Corp.*, No. 08-CV-3166 (NG), 2009 WL 2366591 (E.D.N.Y. July 31, 2009) (denying the request for attorneys' fees even though the plaintiff's claims were "without merit" and "her response to defendants' motion was cursory").

## II.   **The Village Defendants' Motions to Dismiss**

Plaintiffs allege they were deprived of their civil rights under Section 1983 (1) by Carpenter

when he complained about Plaintiffs because of their gender/sex and (2) by the Village for hiring,

retaining, and failing to train and/or supervise Carpenter despite being aware of his discriminatory

actions and inactions.[8] (Pl. MTD Opp. at 11-12.) The Village Defendants argue Plaintiffs' claims

should be dismissed because (1) Plaintiffs failed to allege a policy, practice, or custom and (2)

Carpenter was not acting under color state law. (Village Mem. at 7-9; Carpenter Mem. at 3-5.) For

the reasons stated below, the Court dismisses Plaintiffs' claims against the Village Defendants.

   a.  *Legal Standards*

For a person to state a claim under Section 1983, a plaintiff must allege "(1) the challenged

conduct was attributable to a person who was acting under color of state law and (2) the conduct

deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York*,

No. 09 Civ. 5446, 2013 WL 1803896, at *2 (S.D.N.Y. April 25, 2013); *see Cornejo v. Bell*, 592

F.3d 121, 127 (2d Cir. 2010). Therefore, a Section 1983 claim has two essential elements: (1) the

defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff

suffered a denial of his federal statutory rights, or his constitutional rights or privileges. *See Annis*

*v. Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Quinn v. Nassau Cnty. Police Dep't*, 53

F. Supp. 2d 347, 354 (E.D.N.Y. 1999) (noting that Section 1983 "furnishes a cause of action for

the violation of federal rights created by the Constitution") (citation omitted).

For a plaintiff to allege a Section 1983 claim against a municipal defendant, he must allege

that an action pursuant to official municipal policy caused the alleged constitutional deprivation.

*Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 690–91 (1978); *see Askew v. Lindsey*,

---

[8] The Village Defendants fully briefed their respective motions on December 12, 2023: Carpenter's Motion to Dismiss (ECF No. 45); Carpenter's Memorandum of Law in Support ("Carpenter Mem.," ECF No. 46); Declaration of Michael A. Czolacz (ECF No. 47); Carpenter's Reply ("Carpenter Reply," ECF No. 50); the Village's Motion to Dismiss ("Village Mem.," ECF No. 48); and the Village's Reply ("Village Reply," ECF No. 49). On December 13, 2024, Plaintiff filed its Opposition ("Pl. MTD Opp.," ECF No. 52). Citations to "Carpenter Ex." refer to the exhibits attached to the Declaration of Michael A. Czolacz.

No. 15-CV-7496 (KMK), 2016 WL 4992641, at *2 (S.D.N.Y. Sept. 16, 2016) ("A municipal defendant 'cannot be held liable under § 1983 on a *respondeat superior theory*.' . . . Rather, for a plaintiff to prevail on a § 1983 claim against a municipal defendant, he must satisfy the requirements set forth in *Monell* and its progeny, which adhere to the well-settled principle that 'Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort.'") (citing *Monell*, 436 U.S. at 691). Thus, "to state a *Monell* claim, '[t]he plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries . . . . Second, the plaintiff must establish a casual connection— an 'affirmative link'—between the policy and deprivation of his constitutional rights.'" *Guerrero* v. City of N.Y., 12-CV-2916, 2013 WL 673872, at *2 (S.D.N.Y. Feb. 25, 2013) (citing *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir.1985), *cert. denied* 480 U .S. 916 (1987)).

Even at the pleading stage, the mere assertion that the municipality has such a custom is insufficient to assert a Section 1983 claim against a municipality without supporting factual allegations. *Id.* at *2 (citing *Zahra v. Town of Southold*, 48 F.2d 674, 685 (2d Cir.1995)). Furthermore, even a single incident of unconstitutional activity has been deemed insufficient to impose liability upon a municipality under Section 1983. *See Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.") Thus, at the motion to dismiss stage, "a plaintiff cannot merely allege the existence of municipal policy or custom but must instead 'allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists.'" *Askew*, 2016 WL 4992641, at *3 (*citing Johnson v. City of N.Y.*, 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y.

Feb. 15, 2011)).

    b.  *Application*

Plaintiffs' case can be summarized as follows: Police Chief Carpenter made at least three calls to the CVS Defendants complaining about Plaintiffs' reporting of suspected shoplifting and during those calls used discriminatory language regarding Plaintiffs' gender/sex. Carpenters' complaints prompted the CVS Defendants to investigate his concerns, which resulted in the CVS Defendants discriminating against and terminating Plaintiffs. Plaintiffs allege the CVS Defendants' stated reasons for their discrimination, the violation of CVS policies, were pretextual; the CVS Defendants merely wanted to placate the PMPD. The Village is allegedly liable for Carpenter's actions because they hired, retained, and failed to train/supervise him despite knowing of his discriminatory actions.

Plaintiffs' claims against the Village Defendants face a fundamental problem. It is well-settled that courts should ensure that "constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *United States v. Stein*, 541 F.3d 130, 146 (2d Cir. 2008) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)) (emphasis in original); s*ee also Beverley v. Douglas*, 591 F. Supp. 1321, 1329 (S.D.N.Y. 1984) ("The Fourteenth Amendment applies only to acts of the states, not to conduct of private persons."). "Such responsibility is normally found when the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *Stein*, 541 F.3d at 147 (quoting *Blum*, 457 U.S. at 1004). A state "merely approv[ing] or acquiesc[ing] in the initiatives of the private entity" does not suffice. *Id.* at 146 (quoting *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 547, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987)) (cleaned up). Plaintiffs'

Complaint, however, lacks any factual allegations showing that the Village Defendants are in any way responsible for the CVS Defendants terminating their employment.

Plaintiffs fail to establish either a municipal policy or practice or any causal connection between the Village Defendants' actions and their termination. Plaintiffs attempt to draw a direct line between their suspected shoplifting reports, Carpenter's communication with CVS, and CVS's decision to terminate them for violating company policies. However, Plaintiffs fail to allege that the Village Defendants had any control or direction over the CVS Defendants' decision to terminate them. *See Ashby v. Cnty. of Nassau*, 351 F. Supp. 2d 30, 32 (E.D.N.Y. 2004) (holding municipality could not be held liable because plaintiff failed to allege a causal connection between municipal policy and the alleged violation of her civil rights despite plaintiff's assertion that the municipality encouraged her termination); *see also Regan v. Vill. of Pelham*, No. 19 CIV. 7987 (NSR), 2021 WL 1063320, at *6 (S.D.N.Y. Mar. 19, 2021) (finding a municipal corporation cannot be held liable for the actions of a school district because they are two separate and distinct entities). Plaintiffs' allegations that the CVS Defendants were "pressured" by the PMPD and that "keeping the police happy was a likely CVS management objective" (Compl. ¶¶ 57, 144) are insufficient to establish the municipality significantly encouraged or coerced their termination. Three phone calls by the Chief of Police that Plaintiffs chiefly characterize as complaints and concerns cannot constitute state action. Plaintiffs' pleadings therefore fall far short of asserting that the Village, as a municipality, is liable for the personnel decisions of CVS, a private entity.

Likewise, Plaintiffs have failed to allege that Carpenter took any state action. As Defendants note, the civil rights' protection afforded by Section 1983 do not prohibit state officials from simply exercising their rights to free expression. X-*Men Sec., Inc. v. Pataki*, 196 F.3d 56, 70 (2d Cir. 1999) ("Cases holding that a decisionmaker may not take action for impermissible reasons

do not provide the proper analytical framework for claims against persons who are not decisionmakers but merely advocates."). Here, Plaintiffs' Complaint lacks any factual allegations that Carpenter engaged in any conduct beyond complaining to the CVS Defendants about Plaintiffs' shoplifting reporting activity and their gender/sex. Plaintiffs fail to allege that Carpenter used his authority as Chief of Police to coerce, threaten, or even encourage the CVS Defendants to terminate Plaintiffs. Accordingly, Plaintiffs' Section 1983 claim against Carpenter fails.[9]

In short, Plaintiffs allege a conspiracy built on speculation and conjecture wherein a police chief, so concerned about the crime rates and uncomfortable with women in leadership positions, pressures a private company to terminate two managers. Plaintiffs, however, cannot manufacture a constitutional claim by merely pointing to the discriminatory remarks of a single police chief on a handful of phone calls and asserting in conclusory fashion that his actions were motivated by Plaintiffs' gender. The Court therefore dismisses Plaintiffs' Section 1983 claims against the Village Defendants.

## III.    Plaintiffs' Negligent Infliction of Emotional Distress Claim

A plaintiff is entitled to recover for negligent infliction of emotional distress when she has sustained a mental or emotional injury not as a result of another's intent, but as a result of another's negligence. *See Consolidated Rail Corp v. Gottschall,* 512 U.S. 532, 544 (1994) ("The injury we deal with here is mental or emotional harm (such as fright or anxiety) that is caused by the negligence of another and that is not directly brought about by a physical injury, but that may manifest itself in physical symptoms."). "To plead a negligent infliction of emotional distress claim

---

[9] In a recent decision, the Supreme Court observed that "[a] government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead." *Nat'l Rifle Ass'n of Am. v. Vullo,* No. 22-842, 2024 WL 2751216, at *7 (U.S. May 30, 2024). However, she cannot "use the power of the State to punish or suppress disfavored expression." *Id.* The Supreme Court ultimately found that the defendant, a Superintendent for the New York Department of Financial Services, violated the National Rifle Association's ("NRA") First Amendment free speech rights when she threatened enforcement actions against insurance companies and financial services institutions that refused to disassociate from the NRA.

under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021).

Plaintiffs each allege that their termination caused depression, nightmares, sleeplessness, stress, mental and emotional distress, fear, anxiety, and financial hardship. (Compl. ¶¶ 200-201.) Wellington further alleges she endured pain and physical suffering due to having to abruptly end her physical therapy sessions and doctor visits after losing her health insurance.[10] (*Id.* ¶ 185.) The Village Defendants argue that Plaintiffs negligent infliction of emotional distress claim should be dismissed because Plaintiffs fail to allege (1) their conduct endangered Plaintiffs' physical safety and (2) that the Village Defendants owed them a duty. (Village Mem. at 9-10; Carpenter Mem. 5-7.) In their Opposition, Plaintiffs fail to present any arguments to support their claim for negligent infliction of emotional distress other than "Plaintiffs pleaded facts sufficient to support this claim against the Village Defendants." (Pl. MTD Opp. at 15.) The Court disagrees with Plaintiffs.

Plaintiffs fail to allege that any of the Village Defendants owed them a special duty. Under New York law, a plaintiff can establish a claim for negligent infliction of emotional distress if her injuries arise out of one of three theories: (i) the bystander theory, (ii) the "zone of danger" theory, or (iii) the direct duty theory. *See Taggart v. Constabile,* 131 A.D.3d 243, 252 (2d Dep't 2015);

---

[10] Carpenter also argues Plaintiffs' state law claim should be dismissed because their Notice of Claim fails to state a cause of action for negligent infliction of emotional distress. (Carpenter Mem. at 7-9.) Under New York law, a notice of claim is a condition precedent to bringing a personal injury action against a municipal corporation, or any of its officers, agents, or employees. N.Y. Gen. Mun. Law §§ 50-e(1), 50-i(1); see *Parise v. N.Y.C. Dep't of Sanitation*, 306 Fed. App'x 695, 697 (2d Cir. 2009); *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999). In their Notice of Claim, Plaintiffs allege substantially the same factual allegations underlying their negligent infliction of emotional distress claim in their Complaint. (*Compare* Carpenter Ex. B ¶¶ 24-29 *with* Compl. ¶¶ 182-187, 200-201.) Accordingly, the Court finds Plaintiffs' Notice of Claim sufficient. *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 111 (E.D.N.Y. 2011) (finding Notice of Claim sufficient where plaintiff "indirectly mentioned" cause of action for negligent and intentional infliction of emotional distress by stating in her Notice she suffered "loss of self esteem and emotional stress").

*see also Kennedy v. McKesson Co.,* 58 N.Y.2d 500, 504 (1983). Under the direct duty theory, "the duty must be specific to the plaintiff and not some amorphous free-floating duty to society." *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 299 (S.D.N.Y. 2015); *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996). Plaintiffs have alleged no such duty that the Village Defendants specifically owe them. Accordingly, Plaintiffs' negligent infliction of emotional distress claim fails.

## IV.    Leave to Amend

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (internal quotation marks omitted). "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Given that this is the first pleading for which motion practice occurred, the Court grants Plaintiffs leave to file an Amended Complaint. *See Ashbury*, 351 F.Supp.2d at 32 (granting plaintiff leave to amend).

## CONCLUSION

For the foregoing reasons, the CVS Defendants' motion to compel arbitration is GRANTED and their motion for attorneys' fees and costs is DENIED. Plaintiffs and the CVS Defendants are directed to promptly pursue arbitration and to notify the Court and the Village Defendants when the arbitration is concluded.

The Village Defendants' motions to dismiss are GRANTED. Plaintiffs' claims against the Village Defendants are dismissed without prejudice. Plaintiffs are granted leave to file an

Amended Complaint by July 5, 2024. Plaintiffs are advised that the Amended Complaint will replace, not supplement, the Complaint, and so any claims that they wish to pursue must be included in, or attached to, the Amended Complaint. Should Plaintiffs file an Amended Complaint, the Village Defendants are directed to answer or otherwise respond by July 26, 2024. If Plaintiffs fail to file an Amended Complaint within the time allowed, those claims that were dismissed without prejudice will be deemed dismissed with prejudice.

The Court is directed to terminate the motions at ECF Nos. 45, 48, and 54.

Dated:    June 4, 2024                                         SO ORDERED:
          White Plains, New York

                                              _____
                                                      NELSON S. ROMÁN
                                                 United States District Judge